GILLAM v LLOYD

Docket No. 87341. Submitted June 5, 1987, at Lansing. Decided November 7, 1988. Leave to appeal applied for.

Robert Gillam was fifty-two years old and suffering from multiple debilitating physical conditions when a jury in Genesee Circuit Court convicted him of assault with a dangerous weapon. The court remanded Gillam to the Genesee County Jail pending preparation of a prebail investigation report and requested a medical assessment to determine whether there would be problems managing Gillam in the county jail. An examination by Jerry Hall, the physician's assistant at the jail, revealed that Gillam was suffering from congestive heart failure, pulmonary emboli, arteriosclerotic heart disease, traumatic arthritis of the pelvis, and chronic lower back syndrome with postpelvic fracture pain. Dennis M. Lloyd, the supervising physician at the jail, requested that Gillam be released from jail because he was viewed as a high risk person. The court authorized Gillam's release the next day. On the recommendation of Celeste Nostrand, Gillam's probation officer, and a psychiatrist, the court sentenced Gillam to five years probation and one year in the county jail, with the jail sentence deferred as long as Gillam participated in a community service program. Gillam missed his first community service placement meeting, although he contacted his probation officer thirty minutes before the meeting was to begin and informed her that his car had broken down and he would be late. As a result of missing the meeting, Gillam was incarcerated in the county jail on March 25, 1982. On March 26, 1982, Dr. Lloyd performed an abbreviated physical examination of Gillam and prescribed Zomax, a nonnarcotic

REFERENCES

Am Jur 2d, Evidence §§ 336-338
Am Jur 2d, Municipal, County, School and State Tort Liability §§ 111 et seq., 294 et seq.
Am Jur 2d, Negligence §§ 127 et seq., 153 et seq.
Am Jur 2d, Trial § 427.
Am Jur 2d, Witnesses § 4.
See the Index to Annotations under Character and Reputation; Foreseeability; Governmental Immunity or Privilege; Proximate Cause.

drug, for Gillam to replace the narcotic Tylenol #4 prescribed by Gillam's private physician for Gillam's pain. Gillam also complained of pain in every part of his body touched by Lloyd. No x-rays were taken of Gillam. On April 1, 1982, Jerry Hall conducted a complete physical examination of Gillam. Gillam complained that he could not eat solid foods because it made his pelvis, back, and legs feel as though they were on fire. He also complained of pain radiating from his pelvic bone to his leg causing his right knee to buckle. Hall ordered blood tests because he thought Gillam's weakness might be caused by a potassium problem. No x-rays or gastrointestinal tests were recommended. Also on April 1, a police lieutenant at the jail called the probation officer and requested that Gillam be removed from the jail. The probation officer replied that if Gillam's condition worsened to the extent that hospitalization was needed, the judge would agree to release Gillam. The judge had not been contacted. Gillam remained in jail and continued to complain of burning in his stomach. On April 11, 1982, Gillam was found dead in his cell. An autopsy revealed that the cause of death was peritonitis, a secondary infection resulting from a perforated ulcer. Mary Gillam, personal representative of the estate of Robert Gillam, deceased, filed suit against Dennis M. Lloyd, D.O., P.C., the Genesee County Jail, through its governing body, the Genesee County Board of Commissioners, and Celeste Nostrand, the probation officer, in Genesee Circuit Court alleging negligence as to the probation officer, negligence and agency liability as to Dr. Lloyd, and maintenance of a dangerous and defective condition in a public building as to the Genesee County Board of Commissioners. The court, Donald R. Freeman, J., granted a directed verdict in favor of defendant Nostrand on the basis of governmental immunity, and the jury returned a verdict of no cause of action in favor of defendants Lloyd and the Board of Commissioners. Plaintiff appealed.

The Court of Appeals *held:*

1. The trial court properly granted a directed verdict in favor of Nostrand on the basis of governmental immunity as to plaintiff's claim that Nostrand was negligent in having Gillam placed in jail for noncompliance with the court's order concerning the community service program although she knew Gillam had serious medical problems. Nostrand was acting within the course of her employment and scope of authority, was acting in good faith, and was performing a discretionary activity.

2. The court erred in granting a directed verdict in favor of

Nostrand on the basis of governmental immunity as to plaintiff's claim that Nostrand was negligent in failing to obtain Gillam's release from jail when it became clear that he was too sick to be there and in representing to jail officials that she had spoken to the judge about Gillam's release when she had not. However, Nostrand is entitled to a directed verdict as to this claim on the basis that her negligence cannot be considered a proximate cause of Gillam's death.

3. Plaintiff's claim that the instructions given by the trial court to the jury concerning Dr. Lloyd's liability were erroneous need not be addressed because Dr. Lloyd is entitled to governmental immunity.

4. The trial court did not abuse its discretion by refusing to allow plaintiff to call a witness not listed on her witness list.

5. Comments made by the trial judge during the course of the trial and the jury instructions as given by the court did not deny plaintiff a fair trial.

6. The trial court erred in admitting evidence of the details of the crime for which Gillam was convicted, but the error was harmless as to defendant Lloyd since he is entitled to a directed verdict on the basis of governmental immunity and the error does not require reversal of the jury's verdict in favor of defendant Board of Commissioners.

7. Plaintiff's claim that the jail facility constituted a dangerous and defective structure, making the Board of Commissioners liable under the defective building exception to the governmental immunity act, is rejected. Gillam's death was caused by human negligence, not any condition of the building.

Affirmed.

1. JUDGMENTS — DIRECTED VERDICT — APPEAL.

Directed verdicts in civil litigation are appropriate only when no factual question exists upon which reasonable minds may differ; in reviewing a trial court's grant of a directed verdict, the Court of Appeals reviews the evidence in a light most favorable to the nonmoving party.

2. GOVERNMENTAL IMMUNITY — LOWER LEVEL GOVERNMENT OFFICIALS, EMPLOYEES, AND AGENTS.

Lower level government officials, employees, and agents are immune from tort liability only when they are: (1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts.

3. GOVERNMENTAL IMMUNITY — DISCRETIONARY ACTS — MINISTERIAL
   ACTS — QUESTIONS OF LAW.
   A defendant's entitlement to governmental immunity in most
   cases turns on the question whether the defendant's actions
   were discretionary or ministerial, and this determination is a
   question of law for the court; the other requirements for
   governmental immunity, that the defendant acted in the course
   of his employment and within the scope of his authority and
   acted in good faith, are questions of fact, which should be left
   to the jury if reasonable minds could differ.

4. NEGLIGENCE — INJURY — PROXIMATE CAUSE.
   An actor is liable for his negligent conduct only if that conduct
   was the legal or proximate cause of the harm to the plaintiff.

5. NEGLIGENCE — PROXIMATE CAUSE — FORESEEABILITY.
   The question of proximate cause turns upon whether it is foresee-
   able that the actor's conduct may create a risk of harm to the
   victim and whether the injury was foreseeable.

6. GOVERNMENTAL IMMUNITY — TORTS — GOVERNMENT EMPLOYEES —
   MEDICAL PROFESSIONALS.
   The exercise of judgment regarding the treatment of patients by
   government employed medical professionals is inherently a
   discretionary act which, even if negligent, is immune from tort
   liability under the governmental immunity act (MCL 691.1401
   *et seq.*; MSA 3.996[101] *et seq.*).

7. GOVERNMENTAL IMMUNITY — TORTS — SCOPE OF IMMUNITY.
   A court must examine the specific acts complained of, rather
   than the general nature of the activity, when determining the
   existence and scope of an individual's immunity from tort
   liability in a particular situation.

8. COURTS — WITNESSES — EXCLUSION OF WITNESSES.
   A trial court has the discretion to exclude witnesses not listed on
   a party's witness list.

9. TORTS — EVIDENCE — BAD CHARACTER OR HABIT.
   Evidence of a plaintiff's bad character or habit is inadmissible in
   a tort suit for personal injury unless there is a clear relation-
   ship between the bad character or habit and the injury.

10. GOVERNMENTAL IMMUNITY — PUBLIC BUILDINGS.
    The public building exception to governmental immunity applies
    only where an injury is occasioned by a physical defect or
    dangerous condition of a building itself (MCL 691.1406; MSA
    3.996[106]).

*Meklir, Schreier, Nolish & Friedman* (by *Samuel A. Meklir*) and *Zamplas, Paskin, Nagi, Baxter, Johnson & Walker, P.C.* (by *Jeannette A. Paskin*), Co-counsel for plaintiff.

*Cline, Cline & Griffin* (by *Walter P. Griffin* and *Glenn M. Simmington*), for Dennis M. Lloyd, D.O., P.C.

*Nill, Kirby, Rockwell & Swann, P.C.* (by *Patrick M. Kirby* and *Robert H. Shannon*), for Genesee County Board of Commissioners.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Thomas A. Kulick,* Assistant Attorney General, for Celeste Nostrand.

Before: WALSH, P.J., and CYNAR and R. L. TAH-VONEN,* JJ.

R. L. TAHVONEN, J. Plaintiff, Mary Gillam, personal representative of the estate of Robert Gillam, deceased, appeals as of right from a directed verdict in favor of defendant Celeste Nostrand and from a jury verdict of no cause of action in favor of defendants Dennis M. Lloyd, D.O., P.C., and the Genesee County Board of Commissioners. We affirm.

Robert Gillam, plaintiff's decedent, was an inmate at the Genesee County Jail when he died on April 11, 1982, from a perforated ulcer and resulting peritonitis. Plaintiff filed this suit in September of 1982, alleging negligence as to defendant Nostrand, Gillam's probation officer; negligence and agency liability as to defendant Lloyd, the jail's medical director; and maintenance of a dan-

* Circuit judge, sitting on the Court of Appeals by assignment.

gerous and defective condition in a public building as to the Genesee County Board of Commissioners.

The events leading to Robert Gillam's death began on February 15, 1982, when Gillam was convicted by a jury of assault with a dangerous weapon. Gillam was then fifty-two years old and suffered from multiple debilitating physical conditions. Judge Robert Ransom remanded Gillam to the Genesee County Jail pending preparation of a prebail investigation report. Judge Ransom requested a medical assessment to determine whether there would be problems managing Gillam in the county jail. Jerry Hall, the physician's assistant at the jail, performed a physical examination and determined that Gillam was suffering from congestive heart failure, pulmonary emboli (blood clots in the lung), arteriosclerotic heart disease, traumatic arthritis of the pelvis, and chronic lower back syndrome with postpelvic fracture pain. Gillam had no history of ulcer disease. Joan Beck, nursing coordinator at the jail, acting under instructions from her supervisor, Dr. Lloyd, wrote a February 16 memorandum to Judge Ransom describing Gillam's physical problems and requesting his release because he was viewed as a "high risk" person. Judge Ransom authorized Gillam's release from jail the next day.

Defendant Nostrand, Gillam's probation officer, prepared a presentence report. In the report, she detailed Gillam's medical problems and reported that the psychiatrist opined that jail would be the "worse possible thing" for Gillam. She recommended that Judge Ransom sentence Gillam to probation. On March 12, Judge Ransom sentenced Gillam to five years probation and one year in the county jail, "deferred until Tuesday, March 23, 1982, at 9:00 A.M. pending devising and approval of a community service program." Judge Ransom

stated that Gillam would not be jailed if he participated in the community service program, but if Gillam did not cooperate with the program, he would be sent to jail.

On March 19, 1982, Nostrand wrote a memorandum to Judge Ransom requesting that the March 23 jail term be held in abeyance because of difficulties in scheduling Gillam's community service placement. In the memorandum, Nostrand advised the judge that "if Mr. Gillam is noncompliant with the volunteer work, he will immediately be escorted to the jail facility." Judge Ransom approved the memorandum, agreeing to hold the jail term in abeyance.

Gillam was scheduled to report for his first community service placement meeting on March 25, 1982, at 9:00 A.M. Thirty minutes before the meeting, Gillam contacted Nostrand and told her that his car had broken down on the way to the program. Nostrand told Gillam that he had to make the appointment or he would be jailed. Mary Gillam testified that her husband tried for one and one-half hours to get a ride to the placement, but that he did not call a taxi. Later that morning, the director of the placement contacted Nostrand and informed her that Gillam had not kept his appointment. Nostrand took a copy of the court's order to the jail and advised them to arrest Gillam for noncompliance. She contacted Gillam and told him that he was going to jail. Nostrand testified that she interpreted Gillam's failure to report to the placement appointment as noncompliance with the terms of his probation, which, under the terms of her memorandum approved by Judge Ransom, required his incarceration.

Gillam was incarcerated in the Genesee County Jail on March 25. Once incarcerated, the medical staff at the Genesee County Jail was responsible

for treating Gillam's medical problems. Dr. Lloyd, as medical director of the jail, was employed under a contract with the Board of Commissioners which required his presence at the facility 37.5 hours per month. Lloyd's contract stated that he was to supervise all nursing activities, except scheduling and salary, and was to supervise all of the activities of the physician's assistant, Jerry Hall. Lloyd also had a statutory duty to supervise his physician's assistant, pursuant to MCL 333.16109; MSA 14.15(16109); MCL 333.17501; MSA 14.15(17501).

On March 26, 1982, Lloyd performed an abbreviated physical examination of Gillam. Lloyd testified that the only specific complaint made by Gillam during that examination was that he was not receiving Tylenol #4, a medication prescribed by Gillam's private physician, which Gillam had been taking for years to relieve his pain. Lloyd had taken Gillam off Tylenol #4, a narcotic drug, and prescribed Zomax, a nonnarcotic drug, because other patients might try to steal Gillam's narcotics. Lloyd testified that Gillam complained of pain when touched in the abdomen, but that he also complained of pain in any part of his body which Lloyd touched. Lloyd stated that there were no indications that Gillam had an ulcer and that therefore he did not order any x-rays to be taken. Following the examination, Lloyd asked nurse Joan Beck to call Judge Ransom to see if Gillam could again be taken out of the jail, as Gillam was a high risk patient.

Between March 26 and April 1, Gillam refused his medication several times and objected to taking the Zomax which Lloyd had prescribed for him. Gillam was not eating regularly.

On April 1, 1982, Gillam received a complete physical examination from the physician's assistant, Jerry Hall. Hall determined that Gillam was

suffering from the same health problems which had prompted his February 16 release from jail. Hall noted on Gillam's physical chart that during the examination Gillam rolled his eyes around and rambled. This was a new finding which Hall had not noted in his February 15 examination. Gillam complained that he could not eat solid foods because it made his "pelvis, back, and legs feel like they were set on fire." This was also a new complaint, as was Gillam's complaint that pain radiating from his pelvic bone to his leg caused his right knee to buckle.

Hall suspected that a preexisting nerve condition might have caused Gillam's inability to stand, but did not order tests to confirm them. Instead, he ordered blood tests because he thought Gillam's weakness might be caused by a potassium problem. Hall did not suspect an ulcer condition. He stated that Gillam's vital signs were normal and that there were no indications that Gillam was suffering from acute or chronic ulcer disease, the eventual cause of his death. Hall did not recommend x-rays or gastrointestinal tests. He recommended that Lloyd review the physical.

On April 1, Lt. Thayer, an officer at the Genesee County Jail, contacted Nostrand and requested that Gillam be removed from the jail. Thayer asked Joan Beck to speak to Nostrand, whom he identified only as "Celeste," and to see if she could persuade Nostrand to help get Gillam out of jail. Beck testified that she assumed she was speaking to Judge Ransom's secretary, and only later found out that Nostrand was Gillam's probation officer. Beck told Nostrand that Gillam was a high risk patient and that the medical staff feared that he would decompensate and wanted him out of jail. Beck then had Jerry Hall describe Gillam's medical condition to Nostrand. Nostrand told Beck that

she thought Gillam was exaggerating his condition and that the judge was reluctant to let him out. Beck testified that she asked Nostrand to check with the judge and to call her back.

Beck testified that Nostrand returned her call later in the afternoon. Nostrand told her that the judge was still reluctant to let Gillam out, but if his condition worsened to the extent that Gillam needed to be hospitalized, the judge would agree to release him. Although Nostrand did not specifically state that she had spoken to the judge before the second conversation, Beck assumed that Nostrand had spoken to the judge since Beck had requested that Nostrand speak to him about Gillam.

Nostrand testified that she did not speak with Judge Ransom and never intentionally gave Beck the impression that she had spoken to the judge. She also stated that Gillam's medical condition, as described to her, was no different from when he was sentenced. Judge Ransom testified that he was not contacted by Nostrand about Gillam after she sent him the March 19, 1982, memorandum.

On April 2, Lloyd reviewed Gillam's chart and discussed his condition with Hall. Lloyd did not examine Gillam. Lloyd and Hall thought that the burning sensation in Gillam's stomach was caused by indigestion. April 2 was Lloyd's last visit to the jail before his April 5 departure to Florida for a ten-day vacation. Lloyd's contract with Genesee County required that he arrange for another physician to cover for him in his absence, at his own expense. Lloyd arranged for Dr. Steven Hartz, D.O., to be continuously available by telephone for consultation and supervision, but Lloyd made no arrangements for Hartz to visit the jail. Hartz never examined Gillam.

Dr. Dong Yoo, a psychiatrist who worked at the

jail, performed a psychiatric examination on Gillam on April 2. Dr. Yoo recorded in Gillam's chart that Gillam appeared extremely dehydrated and undernourished and was experiencing shortness of breath. Dr. Yoo did not perform a physical, but made these comments based on visual observations.

On April 8, 1982, other inmates in Gillam's cell stated that Gillam was urinating on himself and that they feared he might die. A deputy confirmed that Gillam was urinating on himself. Hall examined Gillam on April 8. Gillam's vital signs remained within normal limits. According to Hall, Gillam was walking normally, with minimal support. Gillam continued to complain of burning in his stomach. Hall wrote on Gillam's chart that gastritis or ulcer disease should be ruled out, but he performed no testing or x-rays which would indicate whether Gillam had gastritis or an ulcer. Hall did not contact Dr. Hartz. Further, although Hall had authority, as did every member of the jail medical staff, to transfer any acutely ill inmate to a hospital, Hall did not believe that Gillam's condition on April 8 warranted hospitalization.

On April 10 at 11:00 P.M., Gillam complained of pain all over his body and stated that "only a shot can help." Nurse Susan Monroe gave Gillam a shot of salt water, a placebo. Dr. Lloyd had earlier approved the use of placebos by the jail staff.

Gillam was found dead in his cell on April 11 at approximately 7:00 A.M. Dr. Mathias Okoye, a pathologist who performed Gillam's autopsy, testified that the cause of death was peritonitis, a secondary infection resulting from a perforated ulcer. Gillam's stomach contained about four quarts of puss. Dr. Okoye determined that Gillam had had an ulcer for one month or more. The puss

from the infection had been in his stomach for seven to eight days. Dr. Okoye also testified that a perforated ulcer causes severe pain.

Dr. Samuel Lerman testified as an expert witness for plaintiff. Lerman stated that the Genesee County Jail was not an appropriate place to house someone with Gillam's medical problems. Lerman opined that Gillam should have been examined at least daily, in view of his medical problems. Gillam should not have been taken off Tylenol #4 and put on Zomax, because a patient in a precarious medical condition should be allowed to continue his old medications. He also stated that Zomax can cause or aggravate ulcers. Lerman opined that, in view of Gillam's complaints during the April 1 examination conducted by Jerry Hall, Lloyd should have examined Gillam. Also, on the basis of those complaints, Gillam should have been sent to a hospital for more extensive tests. Lerman stated that, in his opinion, Gillam's ulcer had perforated before the April 1 examination.

Dr. Larry Farr testified as an expert witness for defendant Lloyd. Farr opined that Lloyd did not breach the standard of care by failing to examine Gillam on April 1, since Gillam showed no appreciable change since the March 26 examination. Nor did the failure to send Gillam out for diagnostic tests on April 1 breach the standard of care, because there were no signs or symptoms indicating that other tests needed to be done. Farr opined that nothing in Gillam's physical charts indicated that Gillam was suffering from an ulcer.

On appeal, plaintiff raises five issues, claiming that (1) the trial judge erred in directing a verdict for defendant Nostrand on the basis of governmental immunity, (2) the trial judge erred by instructing the jury that it should determine whether Dr. Lloyd had a duty to supervise nurses and that the

negligence of the physician's assistant and nurses had to be "reasonably anticipated" by Lloyd before he could be found liable for their conduct, (3) the trial judge erred in failing to permit plaintiff to call Max Redwine as a rebuttal witness, (4) the comments of the trial judge denied plaintiff a fair trial, and (5) the trial judge abused his discretion by admitting evidence of the details of the crime of which plaintiff's decedent was convicted.

I

Plaintiff's first claim is that the trial court erred in granting a directed verdict for defendant, Celeste Nostrand, Gillam's probation officer. Plaintiff's complaint alleged that Nostrand was negligent in two instances: (1) when Nostrand had Gillam incarcerated for failing to attend his community service appointment and violating his probation order and (2) when Nostrand represented to Nurse Joan Beck that she had spoken with Judge Ransom about releasing Gillam and that the judge had refused. The trial court found that Nostrand's actions were protected by governmental immunity under *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984).

Directed verdicts in civil litigation are appropriate only when no factual question exists upon which reasonable minds may differ. In reviewing the trial court's grant of a directed verdict in favor of defendant Nostrand, we review the evidence in a light most favorable to plaintiff. *Brisboy v Fibreboard Corp,* 429 Mich 540, 549; 418 NW2d 650 (1988); *Matras v Amoco Oil Co,* 424 Mich 675, 681; 385 NW2d 586 (1986). If the evidence, viewed in a light most favorable to plaintiff, establishes a prima facie case against Nostrand and avoided governmental immunity, then a directed verdict

was improperly granted. *Dixon v W W Grainger, Inc,* 168 Mich App 107, 110; 423 NW2d 580 (1987); *Kinzie v AMF Lawn & Garden, Division of AMF, Inc,* 167 Mich App 528, 533; 423 NW2d 253 (1988).

Lower level government officials, employees, and agents are immune from tort liability only when they are: (1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts. *Ross, supra,* pp 633-634.

In most cases, a defendant's entitlement to governmental immunity turns on the question whether the defendant's actions were discretionary or ministerial. This determination is a question of law for the court. *King v Arbic,* 159 Mich App 452, 462; 406 NW2d 852 (1987). See also *Ross, supra,* pp 634-635, 640, 650-651.

In *Ross,* our Supreme Court explained the distinction between discretionary and ministerial acts as follows:

> "Discretionary" acts have been defined as those which require personal deliberation, decision, and judgment. [Prosser, Torts (4th ed), § 132, p 988]. This definition encompasses more than quasi-judicial or policy-making authority, which typically is granted only to members of administrative tribunals, prosecutors, and higher level executives. However, it does not encompass every trivial decision, such as "the driving of a nail," which may be involved in performing an activity. For clarity, we would add the word "decisional" so the operative term would be "discretionary-decisional" acts.
>
> "Ministerial" acts have been defined as those which constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice. *Id.* We believe that this definition is not sufficiently broad. An individual

> who decides whether to engage in a particular activity and how best to carry it out engages in discretionary activity. However, the actual execution of this decision by the same individual is a ministerial act, which must be performed in a non-tortious manner. In a nutshell, the distinction between "discretionary" and "ministerial" acts is that the former involves significant decision-making, while the latter involves the execution of a decision and might entail some minor decision-making. Here too, for clarity, we would add the word "operational" so the operative term would be "ministerial-operational" acts. [*Ross, supra,* pp 634-635.

See also *Canon v Thumudo,* 430 Mich 326, 333; 422 NW2d 688 (1988).

The other requirements for governmental immunity, that the defendant acted in the course of his employment and within the scope of his authority and acted in good faith, are questions of fact. Where reasonable minds could differ, these questions should be left to the jury.

Although the *Ross* Court ruled that actions had to be taken in good faith to be immune, the Supreme Court provided little guidance on the meaning of good faith. The Court did state that governmental immunity should not shield malicious or intentionally unlawful behavior. *Ross, supra,* p 633. In *Tobias v Phelps,* 144 Mich App 272, 282; 375 NW2d 365 (1985), this Court wrote that, where the defendants had knowledge of an inmate's serious medical needs, deliberate indifference to those medical needs could constitute bad faith. In *Willoughby v Lehrbass,* 150 Mich App 319, 348; 388 NW2d 688 (1986), this Court stated that

> in order to establish bad faith under *Ross,* it would seem that based upon the policy of the qualified

immunity doctrine a plaintiff would have to establish that the governmental actor engaged in malicious or intentionally unlawful behavior. *Ross, supra,* pp 632-633. Plaintiffs' mere conclusory allegations that these two defendants wilfully or recklessly or negligently failed to supervise Lehrbass simply are not sufficient to establish bad faith on the part of these defendants.

Applying the *Ross* requirements for governmental immunity to plaintiff's first claim against defendant Nostrand, we conclude that a directed verdict was properly entered. Plaintiff alleges that Nostrand was negligent in placing Gillam in jail for noncompliance with the court's order although she knew that he had serious medical problems. Plaintiff concedes that when Nostrand had defendant incarcerated she was acting within the course of her employment and the scope of her authority as a probation officer. Plaintiff claims, however, that Nostrand did not act in good faith. We disagree. Nostrand had Gillam incarcerated pursuant to the memorandum approved by Judge Ransom. This was not an intentionally unlawful act. Further, there was no evidence that Nostrand acted maliciously or from some improper motive in ordering Gillam's incarceration.

Plaintiff is really complaining about Nostrand's determination that Gillam had violated the terms of his probation when he did not attend his community work appointment because his car broke down. This determination was a discretionary decision, however, not a ministerial one. We conclude that defendant Nostrand was entitled to a directed verdict on the basis of governmental immunity on the claim that her act of incarcerating Gillam was negligent. The evidence produced at trial showed that Nostrand was acting within the course of her employment and scope of authority, was acting in

good faith, and was performing a discretionary activity. *Ross, supra.*

Plaintiff's second allegation is that Nostrand was negligent in failing to obtain Gillam's release from jail when it became clear that he was too sick to be there and in representing to jail officials that she had spoken to the judge about Gillam's release when she had not. We conclude that the trial court erred in directing a verdict for Nostrand on this claim on the basis of governmental immunity.

First, Nostrand's role in determining whether Gillam should have been released from jail was a ministerial act. The medical staff of the jail, not Nostrand, was responsible for determining whether Gillam's condition warranted seeking his release, and the judge was responsible for the final decision. Nostrand's role in this determination was merely to convey the relevant information to the judge to allow him to make a decision. Since this task required no decision-making or exercise of discretion, it was a ministerial act. *Ross, supra.* Nostrand is not, therefore, entitled to governmental immunity under *Ross.*

Second, there is a question of fact whether Nostrand was acting in the course of her employment or within her authority in counselling the jail personnel about releasing Gillam, and so a directed verdict was also erroneous on this ground. *Brisboy, supra.* Nostrand testified that her authority ended when Gillam was jailed. She had, then, no authority to act on his behalf. Nostrand also had no authority to tell nurse Beck that Judge Ransom refused to release Gillam when Nostrand had not actually spoken to him. Nor did Nostrand have any authority to interfere in the decision about releasing Gillam. That was the responsibility of the jail medical staff and the judge.

Finally, Beck's testimony could also support a

finding that Nostrand acted in bad faith, which would also disqualify her from governmental immunity under *Ross.* If Beck is believed, a jury could find that Nostrand intentionally or recklessly misrepresented her efforts to contact the judge and misrepresented that the judge had denied the request to release Gillam.

While defendant Nostrand was not entitled to governmental immunity for her actions on April 1, 1982, we conclude that Nostrand is entitled to a directed verdict in her favor on the issue of proximate cause. Under Michigan law, an actor is liable for his negligent conduct only if that conduct was the legal or proximate cause of the harm to the plaintiff. *Brisboy v Fibreboard Paper Products Corp,* 148 Mich App 298, 303; 384 NW2d 39 (1985). "An actor's negligent conduct will not be a legal or proximate cause of the harm to another unless that conduct was a substantial factor in bringing about the harm." *Id.* "Proximate cause" denotes the limitation placed on the actor's responsibility for the consequences of his conduct. "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability." Prosser & Keeton, Torts (5th ed), § 41, p 264. Proximate cause or legal cause, i.e., the defendant's liability for the injury, is primarily a question of law, while cause in fact is a question for the jury. *Moning v Alfono,* 400 Mich 425, 438; 254 NW2d 759 (1977); Prosser & Keeton, *supra,* § 42, pp 272-273.

The question of proximate cause turns upon whether it is foreseeable that the actor's conduct may create a risk of harm to the victim and whether the injury was foreseeable. *Moning, supra,* p 439. The questions of duty and proximate cause are related. Some courts frame the issue as

whether the defendant had a duty to protect the victim from the event which did in fact occur. Prosser & Keeton, *supra,* § 42, p 274.

Plaintiff alleges that Nostrand was negligent in not contacting the judge and seeking Gillam's release when the jail medical staff advised her that Gillam should be released. Plaintiff also alleges that Nostrand was negligent in representing to nurse Beck that she had spoken to the judge and he had refused to release Gillam when she had not. Plaintiff argues that this dissuaded the jail medical staff from further attempts to get Gillam released and ultimately contributed to his death. While we agree that these facts, if believed, established that Nostrand acted negligently, we do not agree that her actions can be considered a proximate cause of Gillam's death.

First, Nostrand had no authority to release Gillam, and there is no evidence that Judge Ransom would have agreed to release Gillam even if Nostrand had relayed the message to him. Second, release pursuant to court order was not the jail medical staff's only option for dealing with Gillam's illness. If Lloyd or any of the medical staff had recognized the seriousness of Gillam's illness, they could have transferred him to the hospital. Everyone on the jail medical staff had that authority.

Third, Nostrand is not responsible for the fact that the jail staff did not contact the judge later, when Gillam's condition worsened. Nostrand's conversation with Beck occurred on April 1. Gillam did not die until April 11, ten days later. Fourth, and most importantly, Nostrand is not liable for the medical staff's failure to properly diagnose and treat Gillam's ulcer condition.

Nostrand had no duty to oversee their medical decisions. It is not foreseeable that Nostrand's

negligence in misrepresenting that she contacted Judge Ransom would prevent the jail medical staff from properly diagnosing Gillam's ulcer condition, from seeking his release again, or from sending him to a hospital. Nostrand's negligence on April 1 cannot be considered a proximate cause of Gillam's death. We conclude that defendant Nostrand is entitled to a directed verdict in her favor on this claim, and we affirm the trial court's ruling on this ground.

II

Plaintiff claims on appeal that the instructions given by the trial court to the jury concerning defendant Dr. Lloyd's liability were erroneous. It is not necessary to address this claim because Dr. Lloyd is entitled to governmental immunity under the recent Supreme Court decision in *Canon v Thumudo, supra.*

Dr. Lloyd contracted with Genesee County to provide medical services for the jail inmates. Dr. Lloyd was, therefore, the county's agent and is entitled to governmental immunity if he meets the *Ross* requirements. *Hayes v Emerick,* 164 Mich App 138, 141; 416 NW2d 350 (1987). Under *Ross,* government agents are protected by governmental immunity if they are: (1) acting during the course of their employment and acting, or reasonably believe that they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts.

There was no claim and no evidence that Dr. Lloyd acted outside the scope of his employment with regard to Gillam's medical care. Nor is there any allegation or evidence of bad faith. Thus, Dr. Lloyd meets the first two requirements for governmental immunity.

In *Canon v Thumudo,* our Supreme Court further explained the distinction between discretionary and ministerial acts in the context of government employed medical professionals, specifically mental health professionals. The Court in *Canon* stated that medical decisionmaking is inherently discretionary and that decisions made by medical professionals about diagnosis and course of treatment are, therefore, entitled to governmental immunity. *Canon, supra,* pp 340, 351, 355. While a government doctor's medical decision as to the proper course of treatment may have been negligent, that decision is discretionary and consequently cloaked by immunity. *Canon, supra,* p 346.

When determining the existence and scope of an individual's immunity from tort liability in a particular situation, the court must examine the specific acts complained of, rather than the general nature of the activity. *Canon, supra,* p 343; *Ross, supra,* p 635. In this case, plaintiff alleged that Dr. Lloyd was negligent in two respects. First, that he personally misdiagnosed and mistreated Gillam's ulcer condition and failed to monitor Gillam's medical condition, which he recognized as serious. Second, that he was negligent in his supervision of the nurses and physician's assistant, who also incorrectly diagnosed and treated Gillam. In both of these claims, the acts complained of are negligent diagnosis and treatment. While plaintiff alleges a breach of a duty to supervise, Dr. Lloyd's decisions about how and when to supervise the jail staff's medical diagnosis and treatment were also medical decisions. Dr. Lloyd determined that Gillam's condition did not require his personal attention, and could be monitored by the jail nurses and physician's assistant. Under *Canon,* these decisions about medical diagnosis and treatment were discretionary acts entitled to governmental immunity

under *Ross.* Dr. Lloyd met the three requirements for governmental immunity under *Ross.* Any errors in the trial court's instructions to the jury concerning Dr. Lloyd's liability were, therefore, harmless beyond a reasonable doubt, since Dr. Lloyd was entitled to a directed verdict in his favor.

### III

Plaintiff claims on appeal that the trial court abused its discretion by refusing to allow Max Redwine, Gillam's cell mate, to testify as a rebuttal witness. Redwine was not listed on plaintiff's witness list, and a pretrial order stated that failure to list witnesses would bar their production at trial. The trial court refused to allow Redwine to testify during plaintiff's case in chief on the basis of this pretrial order. When plaintiff attempted to call Redwine as a rebuttal witness, the trial court again refused to allow his testimony because he was not a listed witness.

The trial court has discretion to exclude witnesses not listed on the party's witness list. *Pollum v Borman's Inc,* 149 Mich App 57, 61; 385 NW2d 724 (1986); *Simonetti v Rinshed-Mason Co,* 41 Mich App 446, 456; 200 NW2d 354 (1972). The trial court did not abuse its discretion by refusing to allow plaintiff to call a witness not listed on her witness list, as required by the pretrial order.

### IV

Plaintiff claims on appeal that the comments made by the trial judge during the course of the trial and the jury instructions as given by the Court denied plaintiff a fair trial. *Moldovan v Allis Chalmers Mfg Co,* 83 Mich App 373; 268 NW2d 656 (1978).

Most of the comments plaintiff complains of occurred out of the presence of the jury. The remarks made by the trial judge in front of the jury were addressed to all counsel and did not single out plaintiff's counsel. Plaintiff also objects to several remarks concerning the role of attorneys made by the trial judge during jury instructions. These remarks did not refer to plaintiff's attorney. The substance of these remarks was consistent with SJI2d 3.04 and was not an erroneous statement of the law. We find no prejudice to plaintiff in any of these remarks. Reviewing the record as a whole, we conclude that plaintiff was not denied a fair trial. *People v Collier,* 168 Mich App 687; 425 NW2d 118 (1988); *Moldovan, supra.*

v

Plaintiff claims that the trial court abused its discretion in admitting evidence of the details of the crime for which plaintiff's decedent was convicted. Plaintiff agreed that the jury could be told that Gillam had been convicted of felonious assault, but brought a motion in limine to exclude evidence about Gillam's specific actions during the commission of the crime. The trial court denied plaintiff's motion, ruling that the actions constituting the felonious assault were relevant to the issue of whether defendant Nostrand's actions were reasonable and to the issue of damages.

During the course of the trial, counsel for defendant made several references to the facts of the assault, telling the jury that Gillam had gone to a neighbor's house and shot a .357 Magnum in a dispute over a bicycle. Defense counsel for Lloyd recited the details of Gillam's crime and questioned Judge Ransom about how these facts affected his sentencing of Gillam. Defense counsel

then asked the judge about the extent of injury to the assault victim. When questioning Lloyd, defense counsel again worked the details of Gillam's crime into his question. Lloyd testified that the medical staff at the jail usually did not know of what crime an inmate had been convicted.

"Relevant evidence" means evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would have been without the evidence. MRE 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. The determination of whether evidence is relevant is within the sound discretion of the trial court. The trial court's decision will not be reversed on appeal absent a showing of abuse of discretion. *Guider v Smith,* 157 Mich App 92, 103-104; 403 NW2d 505 (1987). A trial judge's determination that the probative value of evidence is not substantially outweighed by the prejudicial effect is also subject to an abuse of discretion standard of review. *Kirk v Ford Motor Co,* 147 Mich App 337, 343; 383 NW2d 193 (1985).

Defendants argue that evidence of the details of Gillam's crime was relevant to three issues. First, defendants argue that the evidence was relevant to the jury's determination of damages for loss of society and companionship. Defendants argue that the jury was entitled to know what kind of person Gillam's family lost. We disagree. The fact that plaintiff's decedent was involved in a gunfight with a neighbor is not probative of his capacity for providing society and companionship to his family. The general view is that evidence of a plaintiff's bad character or habit is inadmissible in a tort suit for personal injury unless there is a clear

relationship between the bad character or habit and the injury. 25A CJS, Damages, § 148, p 39. There was no such relationship in this case. Whether or not Gillam was considered a good person by society at large has no relevance to the loss experienced by his family at his death.

Second, defendants contend that the evidence was relevant to Gillam's credibility and that the jail personnel should not be faulted for failing to take Gillam's complaints and symptoms seriously because the details of the criminal assault prove that Gillam was not a credible person. Even if conviction of an assaultive crime is probative of a lack of credibility, a position rejected by our Supreme Court in *People v Allen,* 429 Mich 558, 596; 420 NW2d 499 (1988), that fact was before the jury in this case. There is no evidence that the details of the particular assaultive crime, beyond the mere fact of its commission, would contribute to the jury's ability to assess the credibility of an inmate's statements made during a medical examination. Moreover, Lloyd testified that the medical personnel in the jail were usually unaware of the charge for which a patient-inmate was convicted. Thus, the details of Gillam's crime could not have played any part in the medical staff's assessment of Gillam's medical complaints.

Finally, defendants argue that the evidence was relevant to the alleged liability of Nostrand for her action in incarcerating Gillam in the Genesee County Jail after he failed to report for community service. The evidence showed, however, that Nostrand decided to incarcerate Gillam because he violated the terms of her memorandum to Judge Ransom, not because of the severity of the offense he had committed. Further, plaintiff did not object to introduction of the name of the offense for which Gillam was incarcerated, which would have

provided sufficient evidence of the severity of the offense, if relevant to Nostrand's case.

We do not find that evidence of the details of Gillam's crime was relevant to any issue in the case. Even assuming, arguendo, that the details of the incident were relevant to any of defendants' issues, any probative value was substantially outweighed by the prejudicial effect, and the evidence should have been excluded under MRE 403. Defendants introduced testimony about the details of the crime several times during the trial and in closing argument. That evidence was extremely prejudicial to plaintiff's case.

In other circumstances, the erroneous admission of this evidence could not be considered harmless beyond a reasonable doubt and would require reversal of the jury's verdict. See *People v Stubl,* 149 Mich App 42, 46; 385 NW2d 719 (1986). In this case, however, the error is harmless as to defendant Lloyd since we hold that Lloyd is entitled to a directed verdict in his favor based on governmental immunity. For the reasons discussed in Section VI of this opinion, we also conclude that the erroneous admission of this evidence does not require reversal of the jury's verdict in favor of defendant Genesee County Board of Commissioners.

VI

Plaintiff's complaint included a claim against the Genesee County Board of Commissioners (the county) alleging that the jail facility constituted a dangerous and defective structure, making the county liable under the building exception to the governmental immunity act, MCL 691.1406; MSA 3.996(106). The jury returned a verdict of no cause of action in favor of the county. Plaintiff's posttrial

motion for judgment notwithstanding the verdict and for a new trial, on the ground that the verdict in favor of the county was against the great weight of the evidence, was denied by the trial court.

Plaintiff's brief on appeal does not properly challenge the denial of those motions. The only direct reference to the verdict against the county in plaintiff's appellate brief is a conclusory statement that the verdict was against the great weight of the evidence. This claim is not included in plaintiff's statement of the issues, and plaintiff includes no factual or legal support for this claim in her brief. Plaintiff's conclusory statement is insufficient to bring that claim before this Court. *Sargent v Browning-Ferris Industries,* 167 Mich App 29, 32-33; 421 NW2d 563 (1988).

Reversal of the verdict could be required because of the erroneous and prejudicial introduction of evidence of the details of Gillam's crime. (See Section v.) The county argues that the verdict should not be reversed on that ground because counsel for the county never introduced evidence of the specifics of Gillam's crime and did not argue those facts. We find this argument to be without merit. Even though counsel for the county did not introduce the inadmissible evidence, this was a joint trial and the county benefited from the prejudice to plaintiff's case. The unfair prejudice to plaintiff's case, not defendants' culpability, would be the basis for reversal. Even though the county was not responsible for the error, it would be unjust to allow it to benefit from the unfair prejudice to plaintiff's case.

We conclude, however, that reversal of the verdict is not required because the improper admission of that evidence was harmless error as to plaintiff's claim against the county. We find the

error harmless because the county was entitled to a directed verdict in its favor on plaintiff's claim that the jail was a defective and dangerous structure.

Generally, a government entity is immune from tort liability for actions which accrue while it is performing a governmental function. MCL 691.1407; MSA 3.996(107). This immunity is subject to some limited exceptions, including the public building exception contained in MCL 691.1406; MSA 3.996(106). The public building exception applies to injury arising out of a dangerous or defective physical condition of the building itself. *Reardon v Dep't of Mental Health,* 430 Mich 398, 409; 424 NW2d 248 (1988). "[T]he duty imposed by the public building exception relates to dangers actually presented by the building itself." *Id.,* p 415.

In this case, plaintiff claims that the jail was a defective and dangerous structure because it did not have the facilities to provide Gillam with the medical care he required. This circumstance does not constitute a defective or dangerous condition of a building. The injury to Gillam arose out of the failure of the medical staff to provide him with adequate medical care. There was no evidence at trial that Gillam's injury was caused by a condition of the building. Even plaintiff's expert witness testified that Gillam's death was caused by human negligence, not any condition of the building. The public building exception was not intended to apply to the facts of this case. See *Reardon,* pp 415-417. See also *Guilbault v Dep't of Mental Health,* 160 Mich App 781; 408 NW2d 558 (1987), *Dagen v Village of Baldwin,* 159 Mich App 620; 406 NW2d 889 (1987), and *Lowery v Dep't of Corrections,* 146 Mich App 342; 380 NW2d 99 (1985).

CONCLUSION

We affirm the trial court's order directing a verdict for defendant Nostrand for the reasons stated in Section I of this opinion.

We affirm the jury's verdict of no cause of action in favor of defendant Lloyd for the reasons stated in Sections II and V of this opinion.

We affirm the jury's verdict of no cause of action in favor of defendant Genesee County Board of Commissioners for the reasons stated in Section VI of this opinion.

Affirmed.