YORK v CITY OF DETROIT (AFTER REMAND)

Docket No. 87229. Argued December 4, 1990 (Calendar No. 2). Decided September 23, 1991.

Ruthie Mae York, as personal representative of the estate of William York, Jr., deceased, brought an action in the Wayne Circuit Court against the City of Detroit, alleging that the city was liable for the suicide death of her husband by depriving him of his constitutional right to medical care while in custody, pursuant to 42 USC 1983, by adopting customs, policies, and practices in violation of the applicable law, ordinances, regulations, and court orders; by being deliberately indifferent to the fact that its jail facilities were not in accordance with recognized standards; by its deliberate indifference to suicide prevention; and for the failure to repair a defective condition existing in the jail. The court, Charles Kaufman, J., entered judgment following a jury verdict of no cause of action with respect to the § 1983 claim, but found the city liable with respect to the defective building claim. The Court of Appeals, MICHAEL J. KELLY, P.J., and SULLIVAN and P. R. JOSLYN, JJ., in an unpublished opinion per curiam, affirmed the jury's verdict with regard to the defective building claim, but reversed its verdict of no cause of action with regard to the § 1983 claim, finding that the trial court had erred in refusing to give certain instructions requested by the plaintiff regarding the standard of § 1983 liability (Docket No. 87529). The Supreme Court vacated the decision of the Court of Appeals and remanded the case to that Court. 430 Mich 881 (1988). On remand, the Court of Appeals, MICHAEL J. KELLY, P.J., and SULLIVAN and McDONALD, JJ., reversed in an opinion per curiam, finding that the public building exception to governmental immunity did not apply, and reaffirmed its conclusion that the case be remanded to the circuit court for a new trial regarding the § 1983 claim (Docket No. 109329). The defendant appeals.

REFERENCES

Am Jur 2d, Civil Rights §§ 7, 16-19; Penal and Correctional Institutions §§ 111, 116, 184, 208.

Civil liability of prison or jail authorities for self-inflicted injury or death of prisoner. 79 ALR3d 1210.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY, RILEY, and GRIFFIN, the Supreme Court *held:*

Because the plaintiff's requested jury instructions described an erroneous standard for § 1983 liability, the trial court correctly refused to give them. Thus, the Court of Appeals erred in finding the refusal to give the instructions erroneous and in reversing the jury's verdict of no cause of action with respect to the plaintiff's § 1983 claim.

1. A claim against a municipality under 42 USC 1983 requires a showing that a policy or custom caused a violation of constitutional rights. The policy or custom itself need not be unconstitutional, but an alleged policy of inaction must reflect some degree of fault before it is considered a policy upon which § 1983 liability may be based. Inadequate police training may serve as a basis for liability under § 1983 where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact, establishing a causal link between a municipal policy and a constitutional violation.

2. Deliberate indifference contemplates actual or constructive knowledge and a conscious disregard of a known danger. Mere negligence will not amount to deliberate indifference. A negligent failure to detect suicidal intent or to prevent suicide does not establish deliberate indifference to a prisoner's medical needs, absent some basis to impute knowledge, actual or constructive. Thus, mere negligence cannot constitute a municipal policy of deliberate indifference.

3. Section 1983 itself is not the source of substantive rights, but rather provides a remedy for the violation of guaranteed rights. A pretrial detainee's right to medical treatment is based upon the Fourteenth Amendment and is at least as great as that afforded under the Eighth Amendment to a person convicted of a crime: to be free from deliberate indifference to a serious medical need. Violation of the Fourteenth Amendment right to medical care may be established by a showing of deliberate indifference to a serious medical need. While a serious medical need may encompass both physical and psychiatric problems, a negligent failure to detect suicidal intent or to prevent suicide will not establish deliberate indifference to a prisoner's medical needs.

4. In this case, the trial court correctly declined to give the requested jury instruction which would have reduced the standard of § 1983 liability for an alleged violation of the decedent's right to medical care to mere negligence. The plaintiff was

required to show deliberate indifference in order to establish both an actionable municipal policy and the alleged constitutional violation. Further, the violation of applicable state statutes, or of applicable administrative rules and regulations, ipso facto, does not amount to a constitutional violation. State statutes and regulations do not create federal constitutional rights. Failure to comply with state regulations is not a constitutional violation. Nor did the trial court err in refusing to give the instruction that the defendant was required to know and enforce the rules for jails, lockups, and security camps, because at the time of the decedent's death, the Department of Corrections did not have statutory authority to promulgate rules governing lockups. While an administrative agency may make necessary rules and regulations for the efficient exercise of its expressly granted powers, it may not abridge or enlarge its authority or exceed the powers given to it by the statute under the guise of its rule-making power. Thus, the Department of Corrections rules were not binding on the City of Detroit, and the trial court correctly declined to instruct the jury that the defendant was required to know and enforce those rules.

Chief Justice CAVANAGH, concurring in the result, stated that MCL 791.262; MSA 28.2322 as it existed prior to 1984 explicitly authorized the Department of Corrections to supervise and inspect local jails and promulgate rules and standards relating to them. Local jail is a flexible, common-sense term encompassing facilities which house not only convicted and sentenced criminals, but also suspects detained while awaiting arraignment or trial.

Justice LEVIN, concurring, stated that a lockup in a precinct police station is not a jail or penal institution, and thus the trial court did not err in refusing to instruct the jury regarding the applicability of rules and regulations promulgated by the Department of Corrections on the basis of its supervisory responsibility respecting jails and penal institutions. However, the question whether a lockup located in a facility that serves both as a jail and as a lockup is subject to the department's regulatory authority should be left open.

Reversed.

Justice MALLETT took no part in the decision of this case.

182 Mich App 92; 452 NW2d 641 (1989) reversed.

119 Mich App 512; 367 NW2d 333 (1985) overruled.

1. CIVIL RIGHTS — VIOLATIONS BY MUNICIPAL CORPORATIONS — POLICIES AND CUSTOMS — DELIBERATE INDIFFERENCE.

A claim against a municipality under 42 USC 1983 requires a

showing that a municipal policy or custom caused a violation of constitutional rights; the policy or custom itself need not be unconstitutional, but an alleged policy of inaction must reflect some degree of fault before it is considered a policy upon which § 1983 liability may be based; inadequate police training may serve as a basis for liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact, establishing a causal link between a municipal policy and a constitutional violation (42 USC 1983).

2. CIVIL RIGHTS — JAIL SUICIDES — NEGLIGENT FAILURE TO DETECT — DELIBERATE INDIFFERENCE.

A negligent failure to detect suicidal intent or to prevent suicide of a prisoner does not establish deliberate indifference to the prisoner's medical needs absent some basis to impute knowledge, actual or constructive; deliberate indifference contemplates actual or constructive knowledge and a conscious disregard of a known danger; mere negligence does not constitute a municipal policy of deliberate indifference (42 USC 1983).

3. CIVIL RIGHTS — PRETRIAL DETAINEES — MEDICAL RIGHTS — DELIBERATE INDIFFERENCE.

A pretrial detainee's right to medical treatment is based upon the Fourteenth Amendment and is at least as great as that afforded under the Eighth Amendment to a person convicted of a crime: to be free from deliberate indifference to a serious medical need (US Const, Ams VIII, IX, 42 USC 1983).

*Charlie C. Taylor, P.C.* (by *Horace D. Cotton*), and *Stone & Richardson, P.C.* (by *Ralph H. Richardson*), for the plaintiff.

City of Detroit Law Department (by *Donald Pailen*, Corporation Counsel, and *Joanne D. Stafford*, Assistant Corporation Counsel), for the defendant.

AFTER REMAND

BOYLE, J.

I. INTRODUCTION

We granted leave in this case to determine whether the trial court erred by refusing instructions requested by the plaintiff concerning the

standard for municipal liability under 42 USC 1983. We hold that because the requested instructions were erroneous, the trial court correctly refused to give them. Thus, the Court of Appeals erred in finding the refusal to give the instructions erroneous and in reversing the jury's verdict of no cause of action with respect to plaintiff's § 1983 claim. We reverse the decision of the Court of Appeals and reinstate the jury's verdict with respect to the § 1983 claim.

## II. FACTS AND PROCEDURAL HISTORY

The plaintiff, Ruthie Mae York, initiated this action in 1982 against the City of Detroit for the suicide death of her husband, William York, Jr. The plaintiff alleged that, pursuant to 42 USC 1983, the City of Detroit was liable because it had deprived York of his constitutional rights by "adopt[ing] customs, policies and practices in violation of applicable law, ordinances, regulations and court orders"; by being "deliberately indifferent to the fact that its jail facilities were not in accordance with recognized standards"; and by being deliberately indifferent to suicide prevention. The plaintiff also alleged that the city was liable for failure to repair a defective condition existing in the jail. The specific defects alleged by the plaintiff were the bars across the ceiling of the cell in which the decedent was detained, and the lack of visual monitoring equipment.

After a four-day trial, the jury found no cause of action with respect to the plaintiff's § 1983 claim. The jury did find the city liable with respect to the defective building claim and found the amount of plaintiff's damages to be $650,000, reduced by eighty-two percent because of the decedent's comparative negligence.

The City of Detroit appealed the verdict for the plaintiff regarding the defective building claim; the plaintiff cross appealed, arguing that the trial court had erred by repeatedly telling the jury that the rules promulgated by the Department of Corrections with respect to jails, lockups, and security camps were not mandatory or binding on the city with respect to its operation of precinct lockups, and by refusing to instruct the jury that the city was charged with knowing and enforcing those rules. The Court of Appeals affirmed the jury's verdict regarding the defective building claim, but reversed its verdict of no cause of action regarding the § 1983 claim. Unpublished opinion per curiam of the Court of Appeals, decided July 10, 1987 (Docket No. 87529). The City of Detroit appealed to this Court. We vacated the decision of the Court of Appeals and remanded the case to the Court of Appeals for reconsideration in light of our recent decisions relating to the defective building issue.[1] 430 Mich 881 (1988). On remand, the Court of Appeals found that the public building exception to governmental immunity did not apply, and reversed the jury's verdict in favor of the plaintiff with regard to that claim. The panel then reviewed the city's argument that it should not have granted a new trial regarding the plaintiff's § 1983 claim because any instructional error was harmless. The Court of Appeals reaffirmed its earlier conclusion and remanded the case for a new trial. 182 Mich App 92; 452 NW2d 641 (1989). The defendant again appealed to this Court. We granted leave to appeal in an order issued July 10, 1990. 435 Mich 861 (1990).

At approximately 1:30 A.M. on January 13, 1981,

---

[1] *Velmer v Baraga Area Schools,* 430 Mich 385; 424 NW2d 770 (1988); *Reardon v Dep't of Mental Health,* 430 Mich 398; 424 NW2d 248 (1988).

the police were dispatched to the York family residence with a report of "family trouble." When the police arrived, the decedent's widow, Ruthie Mae York, reported a physical altercation with her husband in which he had pulled a knife and swung it at her. Ruthie Mae York's son intervened in the fight and was cut on the neck, arm, and hand.

According to Ruthie Mae York, the decedent had been drinking heavily that night. Officer George Lapum could smell alcohol on the decedent's breath, but, according to Lapum, the decedent could walk unassisted and Lapum did not recall any staggering. Ruthie York testified, however, that at one point her husband was sitting on the floor with his back against a wall, so drunk he could not get up. A police officer helped him up, and the decedent began swinging at the officer.

The decedent was arrested for felonious assault and transported to the 16th Precinct of the Detroit Police Department. According to Lapum, the decedent went quietly and showed no sign of being suicidal. At the precinct, the decedent was placed in a cell.

Officer Timothy Bar was the "doorman" at the precinct that night. His duties included the processing of incoming prisoners. Bar checked on York at 7:15 A.M., at which time York yelled at him. Bar did not recall what York had said, but described it as an angry yell. According to Bar, there was nothing at all unusual about a detainee yelling at the doorman. Bar noticed nothing that would indicate that the decedent was suicidal. At about 7:30 A.M., a maintenance person discovered the decedent hanging from the bars across the top of the cell in a noose fashioned from his shirt.

The doorman and another officer took the decedent down and called an emergency medical ser-

vice unit. The decedent was taken to a hospital where he was pronounced dead. The coroner's report indicated that the decedent had a blood alcohol level of 0.16 percent, and a urine alcohol level of 0.21 percent.

Before trial, defense counsel moved to exclude any reference to rules promulgated by the Department of Corrections. Counsel for the plaintiff responded that the city's callous indifference to these rules would be evidence of deliberate indifference to decedent's constitutional rights. The court ruled that the department rules did not apply to police station lockups used for the detention of persons not convicted of a crime. Although the rules were held not to be binding, the court ruled that it would allow expert testimony with regard to those rules.

Frank Donley, employed by the Department of Corrections, testified as an expert for the plaintiff. Donley testified regarding the department's rules for jails, lockups, and security camps which were in effect in 1981. He referred to rule 791.555(1), which provides, "A jail or lockup shall provide 1 or more detoxification cells which shall be designed for detention of chemically impaired persons during the detoxification process only," 1979 AC, R 791.555(1), noting that during an inspection of the 16th precinct in 1979, he notified the precinct commander that there was no detoxification cell at the precinct. He also made reference to rule 791.553 regarding visual or electronic surveillance in the area occupied by detainees.[2] 1979 AC, R 791.553.

---

[2] (1) In a jail or lockup, a security area shall have an electronic monitoring system built in so that activities can be checked by the corrections officer and so an inmate can advise the officer of emergency needs. Where applicable, closed-circuit television surveillance equipment may be used.

(2) Where closed-circuit television is not included but is planned or anticipated, space and conduits should be provided

Donley stated that in his opinion, when the decedent was brought to the station, a routine receiving screening form should have been filled out. He further opined that a visibly intoxicated person should be placed in a detoxification cell and should remain under continuous visual observation by one of the precinct staff.

The plaintiff also introduced a 1980 letter from the Department of Corrections to sheriffs and chiefs of police regarding suicides in Michigan jails and lockups. According to the letter, eleven people had committed suicide in Michigan jails and lockups as of June 4, 1980. Seven of those eleven suicides were alcohol related; two were drug related. Most occurred in the Wayne County area, and most in lockups. The letter contained a profile of the person most likely to attempt suicide in detention: a white male, in his twenties, arrested on a minor charge such as driving under the influence of liquor or disorderly conduct. According to the profile, such a person usually attempts or commits suicide within an hour or two of incarceration. The letter described alcohol and drugs as "critical factors," and recommended a number of precautionary actions, including becoming aware of available detoxification or substance abuse programs in the community, reviewing policies on detention practices, particularly where the person

so that the equipment can be installed without need for alteration of the physical plant.

(3) Plans for the use of the equipment shall be submitted to the commission for review and approval before purchase and installation.

(4) Two-way communication capability shall be provided between any remotely controlled security gate or door and its control point.

(5) Outlets for multi-channel radio or television hookup for education and recreational purposes should be provided in an inmate-occupied area.

is detained on substance-related charges, doing more screening during intake, using detoxification facilities, using detoxification cells or placing the intoxicated person in the cell closest to the officer's station, increasing cell supervision, and being prepared to respond to suicide attempts.

Frank Donley testified that he became involved with the training of Detroit precinct doormen in November, 1978, at the request of the Detroit Police Department training division. Detroit Police Inspector and Director of Training James Jackson testified that training is required for precinct doormen and detention officers. This program, consisting of 160 hours of training, began in 1979. The training program included the subjects of mental illness and suicide. Inspector Jackson testified generally that under these subjects, doormen would be trained to take action upon observing overt symptoms of mental illness or potential suicide. He said that violent behavior by itself would not necessarily fall within the rubric of abnormal behavior and that depression "perhaps" would fall in the category of behaviors included under mental illness, as would intoxication. He stated that when detainees were intoxicated to the point of exhibiting abnormal symptoms such as passing out or falling down, or appeared deranged in some way, it was the policy of the department to send them to a hospital. Plaintiff's expert, Frank Donley, acknowledged that it was the policy of the City of Detroit to send persons needing detoxification to the hospital, but expressed doubt whether the policy was practiced.

### III. ANALYSIS

The Court of Appeals found that the trial court had erred in refusing to give certain instructions

requested by the plaintiff. The plaintiff had requested that the trial court instruct the jury as follows:

> I instruct you that the City of Detroit was required by state statute [MCL 791.262; MSA 28.2322] to know and enforce rules 791.553, 791.555, 791.635 and all other applicable provisions of the Michigan Department of Corrections rules and regulations for jails, lockups and security camps.

Plaintiff also requested the following instruction:

> I [f]urther instruct you that since defendant was presumed to know the law, and since Rules 791.553, 791.555 and 791.635, were the law, these rules are further evidence of defendant's knowledge of the serious risk of harm and of steps that a reasonable person in defendant's position would have taken to minimize such risk.
>
> I further instruct you that defendant's failure to comply with the regulation or regulations is evidence from which you may infer, given the totality of the circumstances, that they failed to take the steps a reasonable person in their position would have taken to minimize the serious risk of harm.
>
> If you find all of the above, then you must find defendant liable for deliberate indifference to William York, Jr.'s serious medical needs.

These instructions attempt to describe a standard for § 1983 liability. However, because the requested instructions describe an erroneous standard, the trial court properly declined to give them.

A. STANDARD FOR MUNICIPAL LIABILITY UNDER § 1983

In order to establish a claim against the City of

Detroit under 42 USC 1983, plaintiff was required to show a municipal policy or custom which caused a violation of the decedent's constitutional rights. *Monell v New York City Dep't of Social Services,* 436 US 658, 690-691; 98 S Ct 2018; 56 L Ed 2d 611 (1978).[3] The policy or custom itself need not be unconstitutional. *Canton v Harris,* 489 US 378; 109 S Ct 1197; 103 L Ed 2d 412 (1989). However, the Court in *Canton* made clear that an alleged policy of inaction must reflect some degree of fault before it may be considered a policy upon which § 1983 liability may be based. The Court thus held that inadequate police training may serve as a basis for liability under § 1983 "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The *Canton* Court explained that the requirement of culpability was necessary to establish the causal link between a municipal policy and a constitutional violation:

> This rule is most consistent with our admonition in *Monell* . . . and *Polk Co v Dodson,* 454 US 312, 326 [102 S Ct 445; 70 L Ed 2d 509] (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." [*Id.* at 388-389.]

In the instant case, where the alleged municipal

---

[3] The issue in this case is the liability of the city, not that of individual officers. Since the city cannot be liable on a theory of respondeat superior, *Monell,* 436 US 691, the city's liability must be predicated on a showing that the plaintiff's injuries are the result of municipal policy. See *Roberts v City of Troy,* 773 F2d 720 (CA 6, 1985).

policy was one of inaction,[4] we hold, by analogy to *Canton,* that the city's inaction would constitute a policy or custom sufficient to support a § 1983 claim only if it evidenced a deliberate indifference to the rights of prisoners. The *Canton* Court described facts which might show a policy of deliberate indifference:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. [*Id.* at 390.]

In a concurring opinion, Justice O'Connor phrased the factual standard for finding a policy of deliberate indifference as follows:

> Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied. Only then can it be said that the municipality has made " 'a deliberate choice to follow a course of action . . . from among various alternatives.' " [*Id.* at 396.]

---

[4] Plaintiff made the following allegations in support of her § 1983 claim against the City of Detroit:

(a) It adopted and enforced customs, policies and practices in violation of applicable law, ordinances, regulations and court orders;

(b) It was deliberately indifferent to the fact that its jail facilities were not in accordance with recognized standards; and

(c) It was deliberately indifferent to, and grossly negligent with respect to the recognized and increasing need for preventative techniques in the area of jail suicides.

To determine the meaning of "deliberate indifference" as that phrase was used in *Canton,* it is helpful to examine Eighth Amendment jurisprudence where, in the context of the proscription of deliberate indifference to serious medical needs as cruel and unusual punishment,[5] the words "deliberate indifference" have been filled out and given meaning. The United States Supreme Court has held that mere negligence will not amount to deliberate indifference. *Estelle v Gamble,* 429 US 97, 104; 97 S Ct 285; 50 L Ed 2d 251 (1976). It is established beyond question that a negligent failure to detect suicidal intent or to prevent suicide will not establish deliberate indifference to a prisoner's medical needs. *Molton v Cleveland,* 839 F2d 240, 243 (CA 6, 1988); *Roberts v City of Troy,* 773 F2d 720, 724-725 (CA 6, 1985); *State Bank of St Charles v Camic,* 712 F2d 1140, 1146 (CA 7, 1983). Thus, the federal circuit courts consistently decline to find the failure to take steps to prevent suicide to constitute deliberate indifference absent a previous threat of or attempted suicide. See *Edwards v Gilbert,* 867 F2d 1271, 1275 (CA 11, 1989); *Belcher v Oliver,* 898 F2d 32, 35-36 (CA 4, 1990); *State Bank of St Charles v Camic, supra.* Deliberate indifference contemplates knowledge, actual or constructive, and a conscious disregard of a known danger. Thus, it is clear that mere negligence cannot constitute a municipal policy of deliberate indifference.

### B. STANDARD FOR UNDERLYING CONSTITUTIONAL VIOLATION

Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal con-

---

[5] *Estelle v Gamble,* 429 US 97; 97 S Ct 285; 50 L Ed 2d 251 (1976).

stitution or federal statutes. *Graham v Connor,*
490 US 386, 393-394; 109 S Ct 1865; 104 L Ed 2d
443 (1989). Thus, in order to establish a § 1983
claim, plaintiff was required to show not only a
municipal policy or custom of deliberate indiffer-
ence but, further, that the policy actually caused a
violation of the decedent's constitutional rights.
*Canton, supra* at 381. The alleged constitutional
violation upon which plaintiff's § 1983 claim is
based is the decedent's right to medical care while
he was in the custody of the City of Detroit.

A pretrial detainee's right to medical treatment
is based upon the Fourteenth Amendment, *City of
Revere v Massachusetts General Hosp,* 463 US
239; 103 S Ct 2979; 77 L Ed 2d 605 (1983). The
pretrial detainee's right is at least as great as that
afforded under the Eighth Amendment to a person
convicted of a crime. *Id.* at 244. Under the Eighth
Amendment, a prisoner has a right to be free from
deliberate indifference to his serious medical
needs. *Estelle v Gamble, supra* at 104.

The United States Supreme Court has not de-
fined the exact degree of culpability which must be
shown to establish a violation of the due process
right to medical care. See *Canton v Harris, supra*
at 386, n 8. However, the prevalent rule in the
federal circuit courts defines the right analogously
to that guaranteed convicted prisoners under the
Eighth Amendment. That is, a pretrial detainee's
right to medical care is violated by deliberate
indifference to serious medical needs. *Rushing v
Wayne Co,* 436 Mich 247, 276; 462 NW2d 23 (1990)
(BOYLE, J., concurring).[6] The United States Court
of Appeals for the Eleventh Circuit in *Hamm v*

---

[6] The "deliberate indifference to the serious medical needs" stan-
dard is applied to the detainee's right to medical care in the United
States Court of Appeals for the Sixth Circuit as well, *Molton v
Cleveland, supra* at 243.

*DeKalb Co,* 774 F2d 1567 (CA 11, 1985), cert den
475 US 1096 (1986), cited convincing reasons for
adopting a Fourteenth Amendment standard anal-
ogous to that applied under the Eighth Amend-
ment to test whether a prisoner was unconstitu-
tionally deprived of medical care or treatment:

> Distinguishing the eighth amendment and due
> process standards in this area would require courts
> to evaluate the details of slight differences in
> conditions. Many city and county jails have con-
> victed prisoners and pretrial detainees. That ap-
> proach would result in the courts' becoming "en-
> meshed in the minutiae of prison operations," a
> situation against which the Supreme Court has
> warned. Therefore, the level at which states pro-
> vide pretrial detainees with basic necessities—in
> addition to being "reasonably related to a legiti-
> mate governmental objective"—must meet the
> standards applied under the eighth amendment
> prohibition     on     cruel     and     unusual
> punishment . . . with reference to medical needs,
> they must not be deliberately indifferent to detain-
> ees' serious medical needs. Life and health are just
> as precious to convicted persons as to pretrial
> detainees. [*Id.* at 1574.]

We find that reasoning persuasive and adopt the
prevailing federal approach. A pretrial detainee's
Fourteenth Amendment right to medical care is
violated by deliberate indifference to serious medi-
cal needs.

Thus, the plaintiff could not establish a constitu-
tional violation absent a showing of deliberate
indifference to a serious medical need. Mere negli-
gence does not amount to deliberate indifference.
*Estelle v Gamble, supra* at 106. And while a
serious medical need may encompass both physical
and psychiatric problems, *Roberts, supra* at 724, it
is established beyond question that a negligent

failure to detect suicidal intent or to prevent suicide will not establish deliberate indifference to a prisoner's medical needs. *Molton, supra* at 243; *Roberts, supra* at 724, 725.[7]

### C. INSTRUCTIONAL ISSUES

We conclude that the trial court correctly declined to give the second requested instruction[8] which would have reduced the standard of § 1983 liability for an alleged violation of the decedent's right to medical care to mere negligence.

Plaintiff would have instructed the jury as follows:

> I [f]urther instruct you that since defendant was presumed to know the law, and since Rules 791.553, 791.555 and 791.635, were the law, these rules are further evidence of defendant's knowledge of the serious risk of harm and of steps that a reasonable person in defendant's position would have taken to minimize such risk.

> I further instruct you that defendant's failure to comply with the regulation or regulations is evidence from which you may infer, given the totality of the circumstances, that they failed to take the steps a reasonable person in their position would have taken to minimize the serious risk of harm.

> If you find all of the above, then you must find

---

[7] It is undisputed on the record that, other than his drunkenness, decedent exhibited no behavior that would have put the defendant city on constructive notice that decedent was potentially suicidal. While we are not faced squarely with the question, we note that the United States Court of Appeals for the Fourth Circuit has held that police officers had no absolute duty to prevent a detainee from harming himself merely because he was intoxicated, absent some reason to believe that his intoxication would lead to self-inflicted harm. *Belcher v Oliver, supra* at 35. The Michigan Court of Appeals has also stated that intoxication alone will not normally present a serious medical need. *Smith v Westland,* 158 Mich App 132, 136; 404 NW2d 214 (1986).

[8] For ease of analysis, we deal with the two requested instructions in inverse order.

defendant liable for deliberate indifference to William York, Jr.'s serious medical needs.

The first paragraph of this instruction would have allowed the jury to infer defendant's knowledge of a risk of harm on the basis of the mere existence of the Department of Corrections rules. The second paragraph would have permitted the jury to infer from the defendant's failure to comply with those rules that the defendant failed to take reasonable steps to minimize the risk of harm. If both inferences were made, the jury would have been instructed that it "must" find the defendant liable for deliberate indifference to the decedent's serious medical needs.

The first premise—that the existence of the rules shows the city's knowledge of a serious risk of suicide—is fallacious. As noted above, the law requires actual or constructive knowledge of the risk of suicide before the failure to take steps to prevent that harm will amount to deliberate indifference. *Edwards, Camic, Oliver, supra.* While it is no doubt true that at least one purpose of the Department of Corrections rules is to reduce the risk of jail suicides, it does not follow that the existence of those rules informed the City of Detroit of a suicide risk.

The instruction, by its reference to the steps that a reasonable person would have taken, suggests that the applicable standard by which the defendant's conduct was to be judged was a standard of negligence. By requiring the jury to find the defendant liable for deliberate indifference to the decedent's serious medical needs if the jury drew the permitted inference that the defendant did not act reasonably to minimize the risk of serious harm, the instruction equated negligence with deliberate indifference. This was erroneous

because the plaintiff was required to show deliberate indifference in order to establish both an actionable municipal policy and the alleged constitutional violation.

Most significantly, the instruction defined reasonable steps as those described in the Department of Corrections regulations. In effect, the plaintiff asked the court to tell the jury that failure to follow the department regulations would by itself establish deliberate indifference. Thus, the proposed instructions would have required a verdict for the plaintiff solely on the basis of a finding that the rules were violated. This is contrary to law. The violation of applicable state statutes, or of applicable administrative rules and regulations, ipso facto, does not amount to a constitutional violation. *Edwards, supra; Danese v Asman,* 875 F2d 1239, 1245, n 5 (CA 6, 1989) (state statutes and regulations do not create federal constitutional rights); *Roberts, supra* (failure to comply with state regulations, assuming they apply, is not a constitutional violation).

Finally, we turn to the plaintiff's remaining requested instruction, which would have provided as follows:

> I instruct you that the City of Detroit was required by state statute [MCL 791.262; MSA 28.2322] to know and enforce rules 791.553, 791.555, 791.635 and all other applicable provisions of the Michigan Department of Corrections rules and regulations for jails, lockups and security camps.

The trial court did not err in refusing the plaintiff's requested instruction that the defendant was required to know and enforce the Department of Corrections rules for jails, lockups, and security camps, because at the time of William

York's death, the Department of Corrections did not have statutory authority to promulgate rules governing lockups such as the lockup in the City of Detroit's 16th Precinct police station. By so holding, we overrule the Court of Appeals decision in *Young v Ann Arbor,* 119 Mich App 512; 326 NW2d 547 (1982), remanded on other issues, 422 Mich 901 (1985), which held that the department's regulations mandatorily applied to municipal lockups.

It is clear that the Department of Corrections act, MCL 791.201 *et seq.;* MSA 28.2271 *et seq.,* from its inception, was intended to deal with penal institutions, that is, institutions for the punishment and correction of persons convicted of criminal offenses. Section 4 of the act gives the department exclusive jurisdiction over "penal institutions":

> Subject to constitutional powers vested in the executive and judicial departments of the state, the department shall have exclusive jurisdiction over the following: (a) Probation officers of this state, and the administration of all orders of probation, (b) pardons, reprieves, commutations and paroles, and (c) *penal institutions,* correctional farms, probation recovery camps, prison labor and industry, wayward minor programs and youthful trainee institutions and programs for the care and supervision of youthful trainees. [MCL 791.204; MSA 28.2274. Emphasis added.]

At the time of the events underlying this case, MCL 791.206; MSA 28.2276 provided rule-making authority over penal institutions:

> The director . . . shall promulgate rules and regulations which shall provide:

* * *

(d) For the management and control of state *penal institutions,* correctional farms, probation recovery camps, the wayward minor program and youthful trainee institutions and programs for the care and supervision of youthful trainees separate and apart from persons convicted of crimes . . . . [1966 PA 210, § 6. Emphasis added.]

The plain meaning of the word "penal" excludes from its scope a lockup such as that at the 16th precinct which is used for the temporary detention of persons not convicted of crimes. "Penal," in its plain and commonly understood sense, refers to punishment. The word is defined as "of, pertaining to, or involving legal punishment . . . prescribing punishment . . . used in or for punishment . . . subject to or incurring punishment . . . ." *The Random House College Dictionary* (1984), p 981.

The purported authority for the Department of Corrections' rule-making power over municipal lockups is found in § 62 of the act, which, at the time of the events underlying this case, provided:

The department shall supervise and inspect *local jails and houses of correction* for the purpose of obtaining facts in any manner pertaining to the usefulness and proper management of *said penal institutions* and of promoting proper, efficient and humane administration thereof, and shall promulgate rules and standards with relation thereto; and any reasonable order with respect to *such penal institutions* may be enforced through mandamus or injunction in the circuit court of the county where the *penal institution* is located, through proper proceedings instituted by the attorney general on behalf of the commission. The board of supervisors may determine whether the sheriff's residence is to be a part of the county jail. Any sheriff, superintendent or employee of *any penal institution,* subject to inspection under the provisions of this act, who shall refuse to admit any member of the commission, or any duly

authorized agent of the commission, for the purpose of visitation and inspection, or who shall refuse or neglect to furnish the information required by the commission, or its duly authorized agent, shall be guilty of a misdemeanor, and shall be punished as provided in the laws of this state. [1964 PA 111, § 62. Emphasis added.][9]

The Legislature's reference to "local jails and

[9] In 1984, the Legislature amended § 6 and § 62 making explicit that the rule-making power of the Department of Corrections does not extend to municipal lockups. 1984 PA 102 amended § 6 to authorize the department to promulgate rules

> [f]or the management and control of state penal institutions, correctional farms, probation recovery camps, and programs for the care and supervision of youthful trainees separate and apart from persons convicted of crimes within the jurisdiction of the department. Except as provided for in section 62(3), this subdivision shall not apply to detention facilities operated by local units of government used to detain persons less than 72 hours. [MCL 791.206(1)(d); MSA 28.2276(1)(d).]

1984 PA 102 amended § 62 to make explicit that the rule-making power of the department did not extend to holding centers or lockups:

> (3) The department shall supervise and inspect jails and lockups that are under the jurisdiction of the county sheriff to obtain facts concerning the proper management of the jails and lockups and their usefulness. The department shall promulgate rules and standards promoting the proper, efficient, and humane administration of jails and lockups that are under the jurisdiction of the county sheriff pursuant to the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969, being sections 24.201 to 24.315 of the Michigan Compiled Laws.
> (4) Except as provided in subsection (3), the department shall not supervise and inspect, or promulgate rules and standards for the administration of, holding cells, holding centers, or lockups. However, the department shall provide advice and services concerning the efficient and humane administration of holding cells, holding centers, and lockups at the request of a local unit of government. [MCL 791.262; MSA 28.2322.]

We note that the Court of Appeals in *Davis v Detroit*, 149 Mich App 249; 386 NW2d 169 (1986), held that the amendments were not retroactive. We need not discuss that ruling because we have concluded that the Department of Corrections act, from its inception, did not extend rule-making power to nonpenal facilities such as the 16th precinct lockup.

houses of correction" is paraphrased by its later
description of the same as "said penal institutions"
and "such penal institutions." The Legislature's
language leaves no basis for concluding that "said
penal institutions" include clearly *non*-penal mu-
nicipal lockups. The distinction between jails,
which serve a penal function, and lockups, which
do not, is plain and commonly understood. It is
stated in Black's Law Dictionary (4th ed), pp 968-
969:

> A "jail" is . . . distinguishable both in law and
> in common understanding from a temporary place
> of detention, like a police station or lockup. . . .
> While the primary function of a "jail" is a place of
> detention for persons committed thereto, under
> sentence of a court, it is also the proper and usual
> place where persons under arrest or awaiting trial
> are kept until they appear in court and the charge
> is disposed of.

While a "jail" is commonly understood to be
used to detain persons before trial, it is primarily
a place of detention for persons "under sentence of
a court," that is, persons convicted of misdemean-
ors and minor offenses. We find no basis in the
language of the legislation for authorizing the
department to promulgate rules which are manda-
tory for municipal lockups.

We are not persuaded by the *Young* panel's
interpretation of the authorizing statute by refer-
ence to the rules themselves. The Court in *Young*
noted that the rules by their own terms applied to
lockups and to holding cells within lockups. The
panel reasoned that it would be inconsistent were
the department rules not to apply to a holding cell
within a municipal police station.

The fact that the rules themselves purport to
govern local lockups or holding cells is not control-

ling with regard to the question whether the Legislature authorized the Department of Corrections to promulgate rules governing lockups or holding cells. It is well established that administrative agencies are empowered by statute. *Coffman v State Bd of Optometry Examiners,* 331 Mich 582, 589; 50 NW2d 322 (1951). While an administrative agency may make such rules and regulations as are necessary for the efficient exercise of its powers expressly granted, " 'an administrative agency may not, under the guise of its rule-making power, abridge or enlarge its authority or exceed the powers given to it by the statute, the source of its power,' " quoting *California Drive-In Restaurant Ass'n v Clark,* 22 Cal 2d 287, 302-303; 140 P2d 657 (1943). Because we conclude that the Department of Corrections rules were not binding on defendant City of Detroit, we also conclude that the trial court correctly declined to instruct the jury that the defendant was required to "know and enforce" those rules.[10]

### CONCLUSION

The trial court did not err in declining to instruct the jury as plaintiff requested. The requested instructions were erroneous because they would impose § 1983 liability upon the city on a finding of mere negligence, or upon the violation of rules which, even if applicable, did not establish a violation of constitutional rights. We conclude that the Department of Corrections rules were not binding because the Department of Corrections, at the time of William York's death, did not have rule-making power over municipal lockups such as that involved in this case.

---

[10] Were the rules binding, failure to enforce the rules would not in itself establish a violation of constitutional rights. See *ante,* pp 761-763.

The Court of Appeals erred when it concluded that the trial court should have given the requested instructions and reversed the jury's verdict of no cause of action with respect to plaintiff's § 1983 claim. We reverse the decision of the Court of Appeals and reinstate the jury's verdict with respect to the § 1983 claim.

BRICKLEY, RILEY, and GRIFFIN, JJ., concurred with BOYLE, J.

CAVANAGH, C.J. I agree with the result reached by my Sister BOYLE's majority opinion, and with her sound and scholarly analysis of the federal constitutional and 42 USC 1983 issues. I take exception, however, to that opinion's rejection of the Court of Appeals holding in *Young v Ann Arbor,* 119 Mich App 512; 326 NW2d 547 (1982). *Young* held that the Department of Corrections governing statutes, as they then existed, authorized the department to promulgate rules governing conditions in local lockups and holding cells used to house arrestees and pretrial detainees, in addition to jails and prisons housing convicted criminals. See *id.* at 516-518. With all due respect, my colleague's contrary conclusion in this case engages in the very sort of "exercise in verbal gymnastics" properly criticized in *Young.* See *id.* at 518.

In arguing that the applicable statutes, as they existed prior to 1984, did not authorize the department to regulate "a lockup . . . which is used for the temporary detention of persons not convicted of crimes," *ante,* p 764, my colleague makes short shrift of the language of then-MCL 791.262; MSA 28.2322, which *explicitly* authorized the department to "supervise and inspect *local jails* and . . . *promulgate rules and standards with relation thereto* . . . ." (Emphasis added.) "Local

jail" is a flexible, common-sense term understood by most people familiar with the criminal justice system to encompass facilities which may house not only convicted and sentenced criminals, but also suspects detained while awaiting arraignment or trial.

I see no need or basis in this case to reject the conclusion of the Court of Appeals in *Young.* Admittedly, however, the issue is now largely moot in light of 1984 PA 102, which explicitly provides that the department's regulatory authority does not extend to municipal lockups. See *ante,* p 765, n 9. Because of that, and because the trial court's instruction on this issue was at worst harmless error, in my view, in light of plaintiff's complete failure to establish any underlying constitutional violation, I agree with the result reached by Justice BOYLE.

LEVIN, J. I concur in the view expressed by the majority that a lockup in a precinct police station is not a "jail" or "penal institution," and therefore the trial court did not err in refusing to instruct the jury regarding the applicability of rules and regulations promulgated by the Department of Corrections on the basis of its supervisory responsibility respecting jails and penal institutions.

I would leave open the question whether a lockup located in a facility that serves both as a jail and as a lockup is subject to the regulatory authority of the Department of Corrections.

The conclusion that the trial court did not err in refusing to instruct the jury regarding the applicability of rules and regulations promulgated by the Department of Corrections makes it unnecessary to consider the parameters of a § 1983 claim.

MALLETT, J., took no part in the decision of this case.