REARDON v DEPARTMENT OF MENTAL HEALTH

SCHAFER v ETHRIDGE

Docket Nos. 80362, 80549. Argued January 6, 1988 (Calendar Nos. 8-9). Decided May 16, 1988.

Claudette M. Reardon brought an action in the Court of Claims against the Michigan Department of Public Health, seeking damages for a sexual assault she suffered while residing in a dormitory operated by the defendant, and alleging that her room was unsafe because of the large number of dormitory master keys in circulation. The court, Carolyn Stell, J., denied the defendant's motion for summary judgment on the ground of governmental immunity and, following a trial, determined that the absence of a method of securely locking the door of a dormitory room renders the room dangerous and defective. The Court of Appeals, SULLIVAN, P.J., and SHEPHERD and SHUSTER, JJ., affirmed (Docket No. 88192). The defendant appeals.

Deloris G. Schafer, as guardian of Linda Kay Schafer, a mentally retarded person, and as next friend of Toby Schafer, a minor, brought an action in the Court of Claims against David A. Ethridge, the Department of Mental Health, and others, seeking damages for the sexual assault upon and resulting pregnancy of Linda, a resident of the Oakdale Regional Center for Developmental Disabilities, and for past and future costs of raising Toby, her infant. The plaintiff further alleged that Linda became pregnant while in the center's medical ward as a result of the layout of the ward which created a dangerous and defective condition. The court, Martin E. Clements, J., entered judgment for the plaintiff. The Court of Appeals, MACKENZIE, P.J., and ALLEN and CROCKETT, JJ., reversed, finding that the condition of the center's building did not cause Linda's pregnancy, but rather that the cause was an act of an intervening party, unchecked by the center's personnel (Docket No. 82053). The plaintiff appeals.

In an opinion by Chief Justice RILEY, joined by Justices

REFERENCES

Am Jur 2d, States, Territories and Dependencies §§ 99 et seq.

State's immunity from tort liability as dependent on governmental or proprietary nature of function. 40 ALR2d 927.

LEVIN, BRICKLEY, CAVANAGH, and BOYLE and by Justice GRIFFIN in *Reardon* only, the Supreme Court *held:*

The public building exception to governmental immunity applies only where an injury is occasioned by a physical defect or dangerous condition of a building itself.

1. Generally, a governmental entity is immune from tort liability for actions which accrue while it is performing a governmental function, subject to a limited number of narrowly drawn exceptions. A governmental agency is liable for bodily injury which results from a physical defect or dangerous condition of a public building. Liability may arise because of a failure of a government entity to repair and maintain a public building under its control. In addition, a building may be found to be dangerous or defective because of improper design, faulty construction, or the absence of safety devices.

2. The duty to maintain and repair indicates the Legislature's intent regarding the scope of the public building exception. The intent of the Legislature was to impose a duty to maintain safe public buildings, not necessarily safety in public buildings. Thus, liability arises in cases where the physical condition of the building causes the injury.

3. In these cases, the assaults were the results of acts of intervening parties, rather than dangerous or defective conditions of the buildings themselves. Thus, the public building exception does not apply.

Justice GRIFFIN concurred only in the result in *Schafer.*

Justice ARCHER concurred only in the result in both cases.

*Reardon,* reversed and remanded.

*Schafer,* affirmed.

157 Mich App 505; 403 NW2d 582 (1987) reversed.

158 Mich App 654; 405 NW2d 411 (1987) affirmed.

GOVERNMENTAL IMMUNITY — PUBLIC BUILDINGS.

The public building exception to governmental immunity applies only where an injury is occasioned by a physical defect or dangerous condition of a building itself (MCL 691.1406; MSA 3.996[106]).

*Steven E. Ford* for plaintiff Reardon.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Richard D. Toth*), for plaintiffs Schafer.

*Frank J. Kelley,* Attorney General, *Louis J.*

*Caruso,* Solicitor General; and *George L. McCargar* and *Thomas R. Wheeker,* Assistant Attorneys General, for the defendants in *Reardon;* and *George L. McCargar,* and *Mark S. Meadows,* Assistant Attorneys General, for the defendants in *Schafer.*

Amici Curiae:

*Eileen K. Jennings* for Central Michigan University Board of Trustees.

*Kenneth A. McKanders* for Eastern Michigan University Board of Regents.

*Thomas A. Butcher* for Grand Valley State College Board of Control.

*Michael J. Kiley* for Michigan State University Board of Trustees.

*Libner, VanLeuven & Kortering, P.C.* (by *John A. Braden*), for Michigan Trial Lawyers Association.

*John D. Ketelhut* for University of Michigan Regents.

*Patricia E. Eames* for Wayne State University Board of Governors.

RILEY, C.J. The issue in these consolidated cases is whether the public building exception to governmental immunity is applicable to the facts presented. We are persuaded that the Legislature intended the building exception to apply where the injury is occasioned by a physical defect or dangerous condition of the building itself. As neither case involved an injury caused by the physical condition of the building, we hold that the public building exception is inapplicable to both cases.

FACTS AND PROCEEDINGS

*REARDON v MENTAL HEALTH DEPARTMENT*

In April, 1980, plaintiff, a nursing student, attended Sault College of Applied Arts and Technology in Canada. At that time, plaintiff was residing at the Newberry Regional Mental Health Center (MHC) in Newberry, Michigan. Through an agreement between her school and MHC, plaintiff was in the process of completing a four-month practical training program. MHC provided a dormitory-like residence where the students lived while they were in the program. The residence, called the employee home, was operated by MHC.

Plaintiff's room in the employee home was secured by two locks. The first was key operated and locked automatically when the door was closed. The second was a chain lock. The outside doors of the building were not locked.

On April 17, 1980, plaintiff was asleep, alone in her room. Before going to bed, she had engaged the chain lock. Plaintiff awoke to find Arthur Green, an employee of MHC, in her room. Green, who had been one of plaintiff's instructors, was lying on the floor touching plaintiff's leg. Green climbed into plaintiff's bed and for approximately one-half hour proceeded to touch plaintiff's breasts and genital region. Green attempted, but failed to achieve, sexual intercourse.

Understandably upset about the assault, plaintiff did not complete her training at MHC. She reported the incident to an instructor and the police. Green was apprehended and eventually convicted of fourth-degree criminal sexual conduct. MCL 750.520e; MSA 28.788(5).

On September 2, 1980, plaintiff filed suit in the Court of Claims, naming as defendants the State of Michigan and Michigan Department of Mental

Health, which operated MHC. The gravamen of her complaint was that her room was unsafe because of the number of master keys in circulation among MHC employees which could open her door.

Defendant moved for summary disposition pursuant to GCR 1963, 117.2(1), now MCR 2.116(C), arguing that plaintiff's claim was barred by governmental immunity. The trial court denied that motion.

Following a brief trial, the judge determined that plaintiff had established that she was injured by a dangerous or defective condition of a public building, and, thus, the public building exception was applicable.

Evidence revealed that MHC had issued to its staff eighteen master keys, any of which could unlock plaintiff's door. Apparently, Green had used a duplicate master key to enter plaintiff's room. The record does not indicate how Green was able to obtain his duplicate key.

The trial court reasoned that the lack of a device to secure a room where someone would be sleeping renders that room dangerous or defective. Here, because of the eighteen master keys in circulation among the staff, plaintiff's security was not assured. Further, had plaintiff been warned about the master keys, the judge determined that she could have taken measures to secure the room herself.

The trial court also held that the chain lock itself was insufficient, as was proven in this case, because the chain was "easily defeated." Thus, the chain was actually counterproductive because it created in plaintiff a false sense of security. Therefore, the court concluded that the absence of a secure locking system or a warning to plaintiff rendered the room dangerous, and awarded plaintiff $500,000 in damages.

Defendant appealed, and the Court of Appeals affirmed:

> The existence of eighteen master keys circulated in such a manner as to allow duplication of keys and access to student rooms by unauthorized and dangerous persons could certainly create a dangerous condition of that building, and particularly of plaintiff's room and door. This was, after all, a dormitory on the grounds of a mental health center. The use of a chain lock that could be easily broken without waking a sleeping occupant could also create a dangerous condition. If it was insufficient to provide security, the chain lock could also be viewed as defective. [*Reardon v Mental Health Dep't*, 157 Mich App 505, 511; 403 NW2d 582 (1987).]

Defendant appealed, and we granted leave, limited to the question of the applicability of the public building exception. 428 Mich 910 (1987).

### *SCHAFER v ETHRIDGE*

In November, 1977, Linda Kay Schafer was a resident of Oakdale Regional Center for Developmental Disabilities in Lapeer. Linda had lived at Oakdale since being admitted in 1964.

While physiologically normal, Linda is profoundly mentally retarded. People who are profoundly retarded suffer from the most severe of handicaps in the continuum of developmental disabilities. Linda has approximately the mental capacity of a two-year-old infant. She is not able to feed herself or walk without assistance. Linda can make noises, but has no vocabulary.

Oakdale, operated by the Michigan Department of Mental Health, provides its patients with acute medical care when necessary. When these services are required, the patients are taken to a medical

ward called 2-West, which is on the second floor of a three-story building. On November 2, 1977, Linda was suffering from an infection of her urinary tract and was taken to 2-West, where she stayed until December 16, 1977.

Following her stay on 2-West, Linda returned to her dormitory. In April, 1978, the Oakdale staff discovered that Linda was pregnant. Because of the timing of Linda's menstrual cycle and the results of two ultrasound tests, it was determined that Linda was impregnated during her stay at 2-West. Defendant does not dispute this determination.[1] On August 11, 1978, Linda gave birth to her son, Toby Schafer.

Linda's mother, Deloris Schafer, is her legal guardian, as well as next friend of Toby Schafer. Mrs. Schafer brought an action in the Court of Claims on behalf of Linda and Toby, naming the State of Michigan, Department of Mental Health, and the Oakdale Center as defendants. A suit against individual defendants was consolidated with the action against the state. Plaintiff sought damages for the sexual assault on Linda, her pain and suffering during pregnancy, and the past and future cost of raising Toby.

In the portion of plaintiff's complaint relevant to this appeal, she alleged that Linda became pregnant due to the dangerous and defective condition of 2-West. In order to understand plaintiff's allegation, a brief description of 2-West is required. The Court of Appeals described the ward as follows:

> 2-West is a room approximately forty feet by forty feet in area, with a nursing station to the left of the ward's corridor entry. The nursing station is separated from the ward by a desk-high wall with

---

[1] Defendant also does not dispute that because of her disability, Linda is incompetent to consent to sexual intercourse.

a glass partition extending to the ceiling. In the center of the ward there are two fifteen to twenty-inch wide pillars placed about the same width apart as the corridor. A three-foot-high wall runs from the right pillar to the right side wall. There are no curtains over this partition, but there are curtains running along each side of the corridor which could be drawn, and portable screens could be used to enclose a patient's bed. A door is located in about the middle of the wall opposite the nursing station opening into a stairway which leads to a clinic below and a pediatric and chronic care ward above. The stairway door is kept un-locked and can be opened at any time, although it is not used for normal traffic.

The ward was occupied by both male and female patients in November, 1977, with the male patients assigned to beds between the entrance to the ward and the half-wall partition, and the female patients assigned to beds on the opposite side of the partition. Linda's bed was located on the wall opposite the nursing station, near the stairwell. Seriously ill patients were assigned to beds directly in front of the nursing station. At night the overhead lights were turned off. The ward was illuminated by subdued nightlights at the base of the walls and desk lamps at the nursing station. [*Schafer v Ethridge,* 158 Mich App 654, 655-656; 405 NW2d 411 (1987).]

At trial, plaintiff acknowledged that she could not prove the precise manner by which Linda's assault was accomplished. However, she argued that the combination of a number of factors regarding the layout of 2-West created a dangerous condition which allowed the assault on Linda to happen. Plaintiff argued that the pillars in the middle of the room obscured the view of Linda's bed from the nursing station and were large enough for the assailant to hide behind. The low-ered lighting at night, as well as the door near

Linda's bed by which the assailant could have entered or escaped the ward, were also factors. Further, mixing the genders of the patients on the ward, especially in light of the fact that the wall separating the males and females did not extend to the ceiling, also contributed to the danger.

The trial court agreed with plaintiff, concluding that the combination of these factors created a dangerous or defective condition. The court awarded $282,000 in damages.

Defendants appealed, and the Court of Appeals reversed:

> In this case . . . plaintiff's allegations concerning the defective and dangerous conditions of 2-West stem from the activities or operations conducted within the building. Plaintiff's proofs showed that the structural configuration of the ward allowed access to Linda. Access to a patient under medical care does not constitute a building defect, however; indeed, ready access to patients is critical in a hospital-type setting. The problem in this case is that access to Linda was not restricted by Oakdale Center personnel. The lack of due care in providing such restriction indicates a claim of improper supervision of patients, not a defective condition of the building itself. Simply put, the building did not cause Linda to become pregnant; rather, the act of an intervening party unchecked by Oakdale Center personnel did. [*Schafer, supra* at 661-662.]

Plaintiff appealed, and we granted leave, limited to the issue whether the public building exception was applicable to the facts of this case. 428 Mich 911 (1987).

DISCUSSION

As a general rule, a governmental entity is immune from tort liability for actions which ac-

crue while it is performing a governmental function. MCL 691.1407; MSA 3.996(107). This immunity is broad in scope, subject to a limited number of narrowly drawn exceptions. *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 618; 363 NW2d 641 (1984). One of these exceptions is the public building exception contained in MCL 691.1406; MSA 3.996(106):

> Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition. Knowledge of the dangerous and defective condition of the public building and time to repair the same shall be conclusively presumed when such defect existed so as to be readily apparent to an ordinary observant person for a period of 90 days or longer before the injury took place. As a condition to any recovery for injuries sustained by reason of any dangerous or defective public building, the injured person, within 120 days from the time the injury occurred, shall serve a notice on the responsible governmental agency of the occurrence of the injury and the defect. The notice shall specify the exact location and nature of the defect, the injury sustained and the names of the witnesses known at the time by the claimant.

As always, when interpreting a statute, our purpose is to ascertain and effectuate the legislative intent at the time it passed the act. As we noted in *Hyde v Univ of Michigan Regents,* 426 Mich 223, 244; 393 NW2d 847 (1986):

> [T]he parameters of sovereign and governmental immunity are governed by statute. Our duty is to interpret the statutory language in the manner intended by the Legislature which enacted § 7 in 1964 and amended it in 1970.

In the early 1960s, this Court was on a path leading to the abolishment of sovereign and governmental immunity. The seminal case which signaled this effort was *Williams v Detroit,* 364 Mich 231; 111 NW2d 1 (1961), in which we prospectively abrogated common-law immunity for municipalities. In *Ross,* we discussed the legislative response to *Williams:*

> In reaction to this Court's abolition of common-law governmental immunity for municipalities in *Williams,* and in anticipation of a similar demise of immunity for counties, townships, and villages, the Legislature enacted the governmental immunity act in 1964. The first sentence of § 7 was intended to not only restore governmental immunity to non-sovereign governmental agencies, but to provide uniform treatment for state and local agencies. Furthermore, the affirmance of common-law sovereign immunity in the second sentence of § 7 was a clear directive that this Court henceforth could not further extend *Williams* and judicially abrogate the state's sovereign immunity. [*Ross, supra* at 605-606.]

While the effect of the act was to restore to governmental entities the immunity enjoyed prior to *Williams,* one new category of governmental liability was created. Prior to *Williams,* governmental immunity barred an action for injuries sustained because of the condition of a public building. In fact, the successful assertion of immunity most often occurred in this category of cases. See the cases cited in Cooperrider, *The court, the*

*legislature and governmental tort liability in Michigan,* 72 Mich L R 187, 260-261 (1973).

The governmental immunity act was drafted by the Michigan Association of Municipal Lawyers and lobbied through the Legislature by the Michigan Municipal League. *Thomas v Dep't of State Highways,* 398 Mich 1, 10, n 4; 247 NW2d 530 (1976). An examination of the history of the act reveals that it was drafted with a view toward compromise. See Reese, *Recent developments and problems in municipal law,* 28 NIMLO Municipal L R 563, 600 (1965). Recognizing that the clear judicial trend was to abrogate governmental immunity, the drafters included the public building exception as an alternative to the prospect of judicially eliminated, or potentially more constricted immunity. See *id.,* 599-600; Abels, *Report of committee on tort liability,* 28 NIMLO Municipal L R 432, 464 (1965).

In light of the circumstances surrounding the enactment of this legislation, we are persuaded that the Legislature did not intend an expansive reading of the public building exception. Instead, we conclude that the Legislature intended that the exception apply to facts similar to the facts of *Williams*—the case which precipitated the statute in the first place. In other words, an injury arising out of a dangerous or defective physical condition of the building itself.

This conclusion is buttressed by the language chosen by the Legislature in enacting the public building exception. The first sentence imposes upon governmental agencies the duty to "repair and maintain public buildings under their control . . . ." In *Bush v Oscoda Area Schools,* 405 Mich 716; 275 NW2d 268 (1979), we held that this duty is not strictly limited to the repair or maintenance of public buildings. Instead, we held that "a

building may be dangerous or defective because of improper design, faulty construction or the absence of safety devices." *Id.* at 730. We reiterate this proposition, as the holding in *Bush* is entirely consistent with today's conclusion that the injury must be occasioned by the dangerous or defective physical condition of the building itself. As long as the danger of injury is presented by a physical condition of the building, it little matters that the condition arose because of improper design, faulty construction, or absence of safety devices. However, while the public building exception is not strictly limited to failures of repair or maintenance, the Legislature's choice of those terms to define the governmental duty is indicative of its intention regarding the scope of the exception. The duty to repair and maintain a premises clearly relates to the physical condition of the premises.

In addition, the second sentence of the exception imposes liability on governmental agencies for injuries "resulting from a dangerous or defective condition *of* a public building . . . ." (Emphasis supplied.)

While the use of the word "of" rather than "in" may at first blush appear to present an insignificant distinction, it appears that the Legislature chose its words carefully, as the phrase is repeated later in the same paragraph.[2] A familiar axiom of statutory construction is that when interpreting an act, every word is presumed to have force or meaning and should not be rendered surplusage. *Melia · v Employment Security Comm,* 346 Mich 544, 562; 78 NW2d 273 (1956).

The word "of" is defined as:

    A term denoting that from which anything pro-

---

[2] See the text of the public building exception contained on page 407 of this opinion.

ceeds; indicating origin, source, descent, and the like; as, he is of noble blood. Associated with or connected with, usually in some casual relation, efficient, material, formal, or final. The word has been held equivalent to after; at, or belonging to; in possession of; manufactured by; residing at; from. [Black's Law Dictionary (5th ed), p 975.]

Thus, the Legislature's use of the phrase "dangerous or defective condition *of* a public building" indicates that the Legislature intended that the exception apply in cases where the physical condition of the building causes the injury.

This conclusion is also supported by the broad scope of governmental immunity and the concomitant narrowness of the exceptions. In *Ross,* we undertook a reexamination of the phrase "governmental function" as used in the immunity act. Prior to *Ross,* the law regarding governmental immunity may only be described as chaos, with a number of definitions at different times gaining various degrees of acceptance:

> We recognize that our case law on these questions is confused, often irreconcilable, and of little guidance to the bench and bar. We have made great efforts to reexamine our prior collective and individual views on this subject in order to formulate an approach which is faithful to the statutory language and legislative intent. Wherever possible and necessary, we have reaffirmed our prior decisions. The consensus which our efforts produce today should not be viewed as this Court's individual or collective determinations of what would be most fair or just or the best public policy. The consensus does reflect, however, what we believe the Legislature intended the law to be in this area. [*Ross, supra* at 596.]

After a thorough examination of common-law

governmental immunity, as well as the history of the immunity statute, we determined that governmental function should be defined as "an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." *Ross, supra* at 620.

A corollary to this intentionally broad definition of "governmental function"[3] is the accompanying narrowness of the exceptions:

> This broad grant of immunity, when coupled with the four narrowly drawn statutory exceptions, suggests that the Legislature intended that the term "governmental function" be interpreted in a broad manner. [*Id.* at 618.]

We invited statutory modification of this definition in the event that it did not reflect the Legislature's intent regarding the scope of immunity. *Id.* at 621. The Legislature declined this invitation, and in fact, codified the *Ross* definition practically verbatim.[4] 1986 PA 175, MCL 691.1401; MSA 3.996(101). In so doing, the Legislature put its imprimatur on the broad scope of immunity as defined in *Ross* and, by implication, the narrow scope of the exception.

In light of the historical context in which the statute was enacted, as well as the language chosen by the Legislature, and the generally broad

---

[3]    We realize that the definition we have formulated today is broad and encompasses most of the activities undertaken by governmental agencies. We have adopted this approach because we believe that this is the result envisioned by the enactors of the governmental immunity act. [*Ross, supra* at 620-621.]

[4] The Legislature did modify *Ross* in that it abolished the ministerial versus discretionary test regarding individual immunity. See 1986 PA 175, § 7(2), MCL 691.1407(2); MSA 3.996(107)(2).

scope of immunity, we hold that the Legislature intended the public building exception to apply in cases where the injury is occasioned by the physical condition of the building itself. We recognize that past decisions by this Court have espoused a legislative purpose which is arguably more expansive than that found today. However, these cases may be harmonized with today's holding.

In *Pichette v Manistique Public Schools,* 403 Mich 268; 269 NW2d 143 (1978), the plaintiff was injured on a permanently attached playground slide immediately adjacent to the defendant's school building. In an opinion joined by four other justices on the public building exception issue, Justice FITZGERALD held that the Legislature intended that the statutory exceptions to governmental immunity impose upon governmental entities the duty to maintain safe public places. *Id.* at 285. Thus, the Court found the building exception applicable to the admittedly dangerous and defective slide, despite the fact that the slide itself was not a building. See also *Tilford v Wayne Co General Hosp,* 403 Mich 293; 269 NW2d 153 (1978) (building exception applicable where plaintiff injured on sidewalk immediately adjacent to hospital). This legislative purpose to maintain safe public places was later echoed in *Bush, supra* at 731-732 (public building exception applicable where claimed defect is absence of safety features), and *Lockaby v Wayne Co,* 406 Mich 65, 76-77; 276 NW2d 1 (1979) (building exception applicable where plaintiff alleged lack of padding in cell where he was being held).

The rather broad statement of the legislative purpose contained in the above cases could be explained by the fact that they were all decided prior to *Ross,* which expansively defined "govern-

mental functions."[5] Indeed, in *Pichette, supra* at 280, Justice FITZGERALD expressly adopted a narrow construction of "governmental function."

Furthermore, subsequent to *Ross,* we decided *Jolly v City of St Clair,* 428 Mich 860; 400 NW2d 597 (1987). In *Jolly,* the Court of Appeals held that the public building exception was applicable where the plaintiff alleged a defect in the defendant's slide, which was *not* immediately adjacent to a building:

> [T]he public buildings exception, as interpreted by *Pichette* and subsequent cases, reflects a broad legislative intent to promote safe public places independent of the presence of a building, as that term has been traditionally defined. This intent is best effectuated by applying the exception to the present case. The court's inquiry should not be on whether the public place housed a building, but rather on whether the injury occurred on a place open and intended for use by the public. Since the playground and its slide are just as much a public place as was the playground in *Pichette,* plaintiffs herein are entitled to the same protections as were afforded the plaintiff in that case. [*Jolly v City of St Clair,* 153 Mich App 824, 828; 396 NW2d 552 (1986).]

On appeal to this Court, we reversed:

> The injured party suffered his injury on a slide which was located in a municipal park and which was not immediately adjacent to or part of any public building. . . . Under these circumstances no exception to the city's immunity from tort liability exists. [*Jolly, supra,* 428 Mich 860.]

---

[5] The broad scope of governmental immunity is illustrated in the post-*Ross* decision of *Smith v Dep't of Public Health,* 428 Mich 540; 410 NW2d 749 (1987), in which we held that there is no intentional tort exception to governmental immunity.

Thus, *Jolly* clarifies that the duty to maintain safe public places relates to, but does not extend beyond, the condition of a public building itself or the immediately adjacent premises. By today's holding, we wish to clarify that the duty imposed by the public building exception relates to dangers actually presented by the building itself. To hold otherwise would expand the exception beyond the scope intended by the Legislature when it enacted the immunity act. The Legislature intended to impose a duty to maintain safe public buildings, not necessarily safety *in* public buildings. With this conclusion in mind, we turn to the present cases.

### REARDON v MENTAL HEALTH DEPARTMENT

The Court of Appeals found the building exception to be applicable because of the eighteen master keys in circulation among defendant's employees. This number of keys allowed for duplication and, thus, access to plaintiff's room by outsiders such as plaintiff's assailant. As such, the Court of Appeals reasoned that plaintiff's room was dangerous.

Even assuming that the existence of eighteen master keys was an excessive number,[6] we do not find that such a circumstance constitutes a dangerous or defective condition of a building. There is no evidence that a condition of the building itself contributed to plaintiff's assault. For instance, there was no testimony that the lock on plaintiff's door was itself dangerous or in some way inadequate. Further, there is no evidence that the lock did not function properly. By all accounts, the lock operated exactly as was intended. It locked when

---

[6] There is no testimony in the record upon which to base a determination that the number of master keys in circulation was excessive.

the door shut and opened by the key. While the Court of Appeals may be correct that plaintiff was in danger in the room, that danger did not arise from a dangerous or defective condition of the building. The danger arose from the fact that plaintiff's assailant, in some manner not in evidence, had obtained a master key and had targeted plaintiff as a victim. While we sympathize with plaintiff for the ordeal she endured, we conclude that the Legislature did not intend that the public building exception apply in a case of this nature.[7]

We reverse the judgment of the Court of Appeals and remand this case to the trial court to enter judgment in defendant's favor.

### SCHAFER v ETHRIDGE

While similar to *Reardon* in that plaintiff was sexually assaulted, this case is somewhat different because of the nature of the claimed "dangerous or defective" condition. The trial court found that the combination of mixing the genders on the ward, the pillars in the middle of the room, the location of the nursing station, and the lighting constituted a dangerous condition, rendering the building exception applicable. Plaintiff presented expert testimony that these conditions were not standard in 1977 when the assault took place. However, the evidence reveals that the design of 2-West was standard for the time at which the ward was constructed.

We agree with the Court of Appeals that the layout of 2-West did not constitute a defect or dangerous condition. While 2-West may not have

---

[7] The only arguable defect of plaintiff's room was the chain lock. The record is insufficient to determine whether the chain was defective, as the only evidence regarding the chain was that one of the links was separated to allow Green to enter the room.

been configured in the most modern design possible at the time of the assault, there is no evidence that the physical condition of the ward posed a danger to plaintiff. For example, there is no evidence that the pillars were dangerous or that the partition was unsafe or in need of repair. Thus, there is no evidence that the room itself was unsafe. As distinguished from *Bush,* where no amount of supervision would have compensated for the lack of safety features, proper supervision would have offset any shortcomings in the configuration of the room. As in *Reardon,* we sympathize with plaintiff but conclude that the public building exception was not intended to apply to these facts. We affirm the judgment of the Court of Appeals.

#### CONCLUSION

In summary, the Legislature intended to impose a duty to maintain safe public buildings, but not necessarily safety in public buildings. In both cases, the assaults were the result of the act of an intervening party rather than a dangerous or defective condition of the building itself. Therefore, we conclude that the public building exception does not apply under the facts of these cases. Since the building exception is inapplicable, we need not address the issue of notice of the defect raised by both defendants.

We reverse the judgment of the Court of Appeals in *Reardon.* We affirm the judgment of the Court of Appeals in *Schafer.*

LEVIN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred with RILEY, C.J.; GRIFFIN, J., concurred with RILEY, C.J., in *Reardon,* but concurred only in the result in *Schafer.*

ARCHER, J., concurred only in the result in both cases.