JACKSON v DETROIT

Docket Nos. 97889, 97890. Argued April 5, 1995 (Calendar No. 5). Decided August 9, 1995. Rehearing denied 450 Mich 1211.

Jean Jackson, for herself, and as guardian of Louis Jackson, Jr., a legally incapacitated person, and others, brought actions in Wayne Circuit Court against the City of Detroit and individual police officers, alleging responsibility for Louis Jackson, Sr., attempting to hang himself in a seventh precinct holding cell following his arrest for unlawfully driving away an automobile. The court, Cynthia D. Stephens, J., consolidated the actions, dismissed a 42 USC 1983 and intentional nuisance claims against the city, dismissed claims that individual defendants had violated Jackson's due process right to adequate medical care, but permitted a claim regarding a defect in a public building to go forward. The Court of Appeals, WAHLS, P.J., and GRIBBS and SHEPHERD, JJ., in an unpublished opinion per curiam, reversed the dismissal of the intentional nuisance and § 1983 claims against the city, but affirmed the dismissal of the claims against the individual defendants and the prosecution of the public building claim (Docket No. 112157). The Court granted rehearing on the intentional nuisance claim following the decision in *Li v Feldt,* 434 Mich 584 (1990), and subsequently reversed in an unpublished order. The Supreme Court remanded the case to the Court of Appeals for reconsideration in light of *Hickey v Zezulka (On Resubmission),* 439 Mich 408 (1992), and *York v Detroit,* 438 Mich 744 (1991). On remand, the Court, in an unpublished opinion per curiam, held that summary disposition was properly granted to the defendants with respect to the public building claim and to the individual defendants because of the lack of any specific allegations or evidence that they had violated Jackson's civil rights, and that summary disposition was improperly granted to the city because there was enough evidence to present to the factfinder (Docket No. 155824). The parties appeal.

In an opinion by Justice CAVANAGH, joined by Justices BOYLE, RILEY, MALLETT, and WEAVER, the Supreme Court *held:*

Because there are no genuine issues with respect to any material facts regarding the public building claim and the federal claims against the named individual defendants, they

are entitled to judgment as a matter of law. Because there are genuine issues of material facts regarding the plaintiffs' remaining § 1983 claim against the city, it is not entitled to judgment as a matter of law.

1. A governmental agency is immune from tort liability for actions taken while performing governmental functions, subject to a limited number of narrowly drawn exceptions. To fall within the public building exception, a plaintiff must prove that a governmental agency is involved, that the public building is open for use by members of the public, that a dangerous or defective condition of the public building exists, and that the agency had actual or constructive knowledge of the alleged defect and failed to remedy it after a reasonable period of time. The duty imposed relates to dangers actually presented by the building itself. Where proper supervision would have offset any shortcomings in the configuration of the room, the public building exception does not apply. In this case, Jackson's suicide attempts do not relate to the maintenance of a safe public building; rather, they relate to safety in public buildings, and thus do not come within the narrow confines of the public building exception.

2. Because a pretrial detainee's due process rights under the Fourteenth Amendment are protected to the same extent as the rights guaranteed a convicted person under the Eighth Amendment, a due process violation cannot be proved absent a showing of deliberate indifference; mere negligence does not amount to deliberate indifference. The Eighth Amendment proscribes cruel and unusual punishments, not conditions. Thus, a prison official is not liable for denying an inmate humane conditions of confinement unless the official knows of, and disregards, a substantial risk to the inmate's health or safety. Simple knowledge that a substantial risk exists is not enough. To impose liability, it must be shown that the prison official acted with deliberate indifference. In this case, the police officers discharged their duty. They subjectively knew that Jackson was a suicide risk, and they acted reasonably in light of it. While it may have been negligent to treat him as a routine prisoner, negligence is not deliberate indifference.

3. A governmental entity cannot be found liable under § 1983 on a theory of respondeat superior. Such liability can be imposed only for injuries inflicted pursuant to a governmental policy or custom. There must be an affirmative link between the policy or custom and the particular constitutional violation alleged, and the policy or custom must be the moving force of the violation. In addition, the policy or custom must originate

with the decisionmaker who possesses final policy-making authority regarding the omission or commission at issue. In this case, Jackson's due process right may have been violated and the violation resulted from a city policy of inaction that may evidence a deliberate indifference to the rights of suicidal detainees housed in the seventh precinct station.

Affirmed and remanded.

Chief Justice BRICKLEY, joined by Justice LEVIN, concurring in part and dissenting in part, stated that because the plaintiff's cell presented an obvious mode for his destruction, and because it was designed in part to hold mentally unstable persons like the plaintiff, a question of fact regarding at least whether a dangerous or defective condition existed in the cell under the public building exception was demonstrated.

*Kenneth M. Davies* and *Thomas R. Present*; *Bendure & Thomas,* of counsel (by *Mark R. Bendure* and *Victor S. Valenti*), for the plaintiffs.

City of Detroit Law Department (by *Phyllis A. James,* Corporation Counsel, and *Joanne D. Stafford,* Supervising Assistant Corporation Counsel) for the defendant.

CAVANAGH, J. In these consolidated appeals, we hold that there are no genuine issues with respect to any material facts regarding plaintiffs' public building claim, brought pursuant to MCL 691.1406; MSA 3.996(106), and federal claims against the named individual defendants, brought pursuant to 42 USC 1983. Accordingly, defendants are entitled to judgment as a matter of law for those claims. We hold that there are genuine issues of material facts regarding plaintiffs' remaining § 1983 claim against the City of Detroit. Therefore, the city is not entitled to judgment as a matter of law for that claim.

The decision of the Court of Appeals is affirmed and the case is remanded to the trial court for proceedings consistent with this opinion.

I

All of plaintiffs' claims arise from Louis Jackson's attempted suicide while in the custody of the Detroit Police Department. Jackson was arrested on December 29, 1984, for unlawfully driving away an automobile.[1] After his arrest, he was taken to the seventh precinct station and questioned. Further investigation revealed that Jackson had an outstanding warrant for his arrest, so a "hold" was placed on him.[2] Jackson was put in a felony cell in the male lockup section of the seventh precinct station.

Approximately an hour and a half after being arrested, Officer George Sheridan discovered Jackson standing on the sink in his cell making a noose out of his socks. Jackson was apparently going to hang himself from the exposed overhead bars in his cell. Sheridan called for help and Jackson was taken to the crisis center at Detroit Receiving Hospital for a psychiatric evaluation.

At the hospital, Jackson was eventually seen by Dr. Chen, a psychiatrist. Jackson was diagnosed as having an adjustment disorder with depressed mood and opiate dependence, and Chen recommended that he be admitted to the hospital if the charges against Jackson could be dropped. Jackson was returned to the seventh precinct station with Chen's written and verbal admonition that Jackson be kept under suicide watch.

Upon his return on December 30, 1984, Jackson was placed in another felony cell. This cell, like all the felony cells at the station, had exposed overhead bars. The desk sergeant's report said that Jackson was handled as a "routine" prisoner and

[1] MCL 750.413; MSA 28.645.

[2] This essentially meant that he could not be released from custody until he was brought before a judge on the outstanding warrant.

made no mention of any special precautions or suicide watch.

Nevertheless, the "doorman" on duty (Officer Lakeemba) was aware of Jackson's prior suicide attempt and informed the desk sergeant (Sergeant Keifel). Keifel told Lakeemba to keep a close watch on Jackson. He said that he had personally checked on Jackson three times between 2:15 and 3:30 P.M., with the last check occurring at 3:30 P.M.

The afternoon shift came on duty at 3:30 P.M. When Officer Sheridan arrived and discovered that Jackson had been returned to the lockup, he immediately informed his superior officer, Sergeant Elliot. Recognizing the risk, and somewhat ironically, Elliot told Sheridan to call "911" and have Jackson removed from the precinct. Sheridan made the call and went back to check on Jackson at approximately 3:35 P.M. He discovered Jackson hanging from a noose fashioned from some material, possibly his pants, tied to the exposed overhead bars of his cell. Sheridan immediately summoned help. Jackson was given CPR until emergency medical help arrived.

The record in this case shows that there were 128 suicide attempts in Detroit police lockups between 1978 and 1983. Eighty-six percent of them occurred in lockups with exposed overhead bars. Between June 1980 and December 1984, there were thirteen suicide attempts in the seventh precinct station alone. Moreover, the record indicates that "command personnel attempted internal policy change[s] to obviate the presence of the exposed overhead horizontal bars" in all the precincts.[3] In fact, it appears that the city actually did remedy the problem in the third and sixteenth

[3] This fact is established in plaintiffs' requests to admit of September 9, 1986, which were admitted into evidence by the trial court.

precinct stations sometime during 1983-84 by welding a piece of steel over the bars. These modifications were not made to the seventh precinct station's lockup, allegedly, "by the sole authority of Police Chief William Hart."[4]

The plaintiffs brought three separate suits. One against the city (filed in 1985), one against the individual officers (filed in 1987), and a medical malpractice suit[5] against Detroit Receiving Hospital and Dr. Chen. The first two suits were consolidated.

Eventually, the defendants moved for summary disposition, pursuant to MCR 2.116(C)(10), in the consolidated suit. The trial court dismissed the § 1983 claim against the city, an intentional nuisance claim, and the claims against the individual defendants. It ruled, however, that the claim regarding a defect in a public building should go forward.

The parties sought and were granted leave to appeal in the Court of Appeals. That Court reversed the decisions of the trial court on the intentional nuisance claim and the § 1983 claim against the city, but affirmed the dismissal of the claims against the individual defendants and the public building claim.[6] The parties moved for rehearing on the intentional nuisance claim in that Court following this Court's decision in *Li v Feldt,* 434 Mich 584; 456 NW2d 55 (1990). On rehearing, the Court of Appeals reversed itself on the intentional nuisance claim, summarily affirming the trial court on that issue. The parties then filed their applications in this Court. We remanded the case to the Court of Appeals for reconsideration in

[4] *Id.*

[5] The medical malpractice action is not involved in this appeal.

[6] Unpublished opinion per curiam, issued April 26, 1990 (Docket No. 112157).

light of *Hickey v Zezulka (On Resubmission),* 439 Mich 408; 487 NW2d 106 (1992), and *York v Detroit,* 438 Mich 744; 475 NW2d 346 (1991).[7]

On remand, the Court of Appeals ultimately held: 1) summary disposition was properly granted to the defendants on the public building claim, 2) summary disposition was properly granted the individual defendants because of the lack of any specific allegations or evidence that the individual police officers had violated Jackson's civil rights, and 3) summary disposition was improperly granted to the city because there was enough evidence to present to the factfinder regarding the claim against the city.[8]

II

This case is here on a motion for summary disposition, and this procedural posture establishes our standard of review. As has often been repeated when reviewing a MCR 2.116(C)(10) motion, a court must review the documentary evidence[9] and determine whether a genuine issue of material fact exists. All reasonable inferences must be drawn in the nonmovant's favor, thereby giving that party the benefit of any reasonable doubt. *Skinner v Square D Co,* 445 Mich 153, 161-162; 516 NW2d 475 (1994).

We granted leave in this consolidated appeal to consider: 1) whether the city was properly granted summary disposition on the public building claim, 2) whether the individual defendants were properly granted summary disposition, and 3) whether

[7] 440 Mich 894 (1992).

[8] Unpublished opinion per curiam of the Court of Appeals, issued April 27, 1993 (Docket No. 155824).

[9] Of course, a motion brought pursuant to MCR 2.116(C)(10) must be supported by documentary evidence. MCR 2.116(G)(3)(b).

summary disposition was properly denied on the claim against the city. Guided by the appropriate standard of review, we will discuss each of these issues separately.

A

The first issue is whether the city was properly granted summary disposition on the public building claim. As a general matter, a governmental agency, in this case the City of Detroit, is immune from tort liability for actions taken while performing governmental functions. MCL 691.1407(1); MSA 3.996(107)(1).[10] Although very broad, this immunity is subject to a limited number of narrowly drawn exceptions. The applicable exception in this case is the public building exception, MCL 691.1406; MSA 3.996(106).[11]

The most recent pronouncement from this Court regarding the relationship between MCL 691.1406; MSA 3.996(106), and jailhouse suicides is *Hickey, supra*. In that case, the decedent was arrested for drunk driving by a Michigan State University public safety officer and placed in a holding cell at

[10] Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

[11] Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.

Michigan State. The cell had a nine- to ten-foot high ceiling and a concrete bench along one side. Above the bench was a heater supported by four metal brackets. The decedent hanged himself from a bracket.

This Court held that a five-part test determines whether the public building exception governs a particular case. To fall within the narrow confines of the exception, a plaintiff must prove that 1) a governmental agency is involved, 2) the public building in question is open for use by members of the public, 3) a dangerous or defective condition of the public building itself exists, 4) the governmental agency had actual or constructive knowledge of the alleged defect, and 5) the governmental agency failed to remedy the alleged defective condition after a reasonable period of time. *Id.* at 421.

The duty imposed by the public building exception relates to dangers actually presented by the building itself. As recognized in *Hickey,* the purpose of the public building exception is to promote the maintenance of safe public buildings, not necessarily safety in public buildings. Thus, where proper supervision would have " 'offset any shortcomings in the configuration of the room,' " the public building exception does not apply. *Id.* at 422.

In rejecting the plaintiff's public building claim, this Court noted that no one before Hickey had ever tried to commit suicide in a cell maintained by Michigan State, and that the cells were meant to house detainees only until they could be transported to another facility. More importantly, there was nothing wrong with that cell. There was, however, something tragically wrong with the decedent.

In *Hickey,* this Court was simply unwilling to

allow the decedent's intent to commit suicide to convert the heater and metal brackets into a dangerous and defective condition. At most, the claim in that case related to safety in a public building. It did not relate to the maintenance of a safe public building for the specific use and purpose for which it was assigned.

As in *Hickey*, the only question presented by this case is whether a dangerous or defective condition existed in the seventh precinct station felony holding cells. Thus, it is obvious that *Hickey* controls the resolution of the public building claim in this case even though the facts are distinguishable.[12] Nevertheless, the plaintiffs' claim is more closely related to safety in public buildings than it is to a defect in a public building. As we noted in *Hickey:*

> To suggest that any physical feature of a jail cell, otherwise benign, that can conceivably become a part of a plan of one who is desperately driven to self destruction can become a "dangerous or defective condition" under the public building exception statute, simply crosses the outer limits of any reasonable reading of the intent of that statute when considered in the context of its history, purpose, and wording. [*Id.* at 426.]

Just as in *Hickey*, Jackson's suicide attempt does not relate to the maintenance of a safe public building for the specific use and purpose for which it was assigned. It relates to safety in public buildings, and thus does not come within the narrow confines of the public building exception to governmental immunity.

---

[12] For example, the cells were not temporary detention cells. Moreover, the officers involved were on notice both that the cell could be dangerous, as evidenced by numerous successful and attempted suicides, and that this particular detainee was in fact suicidal.

B

The second issue is whether the § 1983[13] claims against the individual defendants were properly dismissed. In this case, the plaintiffs claim that Jackson's due process right to adequate medical care, as a pretrial detainee, was violated. In *York, supra,* this Court adopted the prevailing federal rule that a pretrial detainee's due process rights under the Fourteenth Amendment are protected to the same extent as the rights guaranteed convicted persons under the Eighth Amendment. Thus, a plaintiff cannot establish a due process violation absent a showing of "deliberate indifference"; mere negligence does not amount to deliberate indifference. *Estelle v Gamble,* 429 US 97, 104; 97 S Ct 285; 50 L Ed 2d 251 (1976).

The most recent pronouncement from the United States Supreme Court regarding what constitutes deliberate indifference to a convicted person's Eight Amendment rights is *Farmer v Brennan,* 511 US —; 114 S Ct 1970; 128 L Ed 2d 811 (1994). *Farmer* holds that to state an actionable Eighth Amendment violation, a plaintiff must prove that specific prison officials acted with "deliberate indifference" to inmate health or safety. The Eighth Amendment outlaws cruel and unusual "punishments," not "conditions." 114 S Ct 1979. Thus, the failure to alleviate a significant risk that an official should have perceived as a risk to an inmate's rights, but did not, cannot be condemned as the infliction of punishment.

This form of deliberate indifference mandates an inquiry into a prison official's subjective state of mind. A prison official cannot be found liable

[13] As we noted in *York,* 42 USC 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes.

under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of, and disregards, a substantial risk to inmate health or safety. The official must both be aware of facts from which the inference that a substantial risk of serious harm exists could be drawn, and he must also draw the inference. *Farmer,* 114 S Ct 1979.

Simple knowledge that a substantial risk exists is not enough, however, to impose liability. A plaintiff also must show that prison officials acted with deliberate indifference:

> In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability *if they responded reasonably to the risk,* even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety." . . . Whether one puts it in terms of duty or deliberate indifference, *prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.* [*Farmer,* 114 S Ct 1982-1983. Citations omitted, emphasis added.]

We assume, given the standard of review, that the individuals involved in this case subjectively knew that Jackson was a suicide risk in light of his prior attempt and the diagnosis of Dr. Chen. We further assume that they knew it was risky to treat him as a "routine" prisoner and place him into a felony cell with exposed overhead bars. What is fatal to plaintiffs' claims against these individuals, however, is the fact that they did, in fact, act reasonably[14] in light of the risk.

For example, as soon as the officers realized

[14] It goes without saying that if one acts reasonably one is not acting with deliberate indifference. Nevertheless, reasonableness is not the standard. Thus, it is theoretically possible that one may act unreasonably but still not be deliberately indifferent.

Jackson's suicidal tendencies, they sent him to see a psychiatrist. And when Officer Lakeemba, who knew of Jackson's earlier suicide attempt, learned that Jackson had returned to the lockup, he immediately informed Sergeant Keifel. Jackson was checked every fifteen minutes, although the regulations required visual inspections of prisoners every thirty minutes.

Similarly, when Sheridan came on duty and discovered that Jackson had been returned to the lockup, he immediately informed his superior officer, Sergeant Elliot. Elliot immediately told Sheridan to make arrangements to have Jackson removed from the lockup. Sheridan made the arrangements and quickly went back to check on Jackson at about 3:35 P.M., only to find him hanging from the overhead bars. Only five minutes had passed between the time Keifel last checked Jackson and Sheridan found him hanging. When Sheridan did find him, he promptly cut Jackson down, and Keifel administered CPR while emergency medical help was summoned.

A prison official's duty under the Eighth Amendment, and correspondingly the Fourteenth Amendment, is to ensure "reasonable safety," nothing more or less. In this case, that duty was properly discharged. These officers subjectively knew of a substantial risk to Jackson's safety, and they acted reasonably in light of the risk. By no stretch of the imagination can they be said to have disregarded a known risk. While it may have been negligent to treat Jackson as a routine prisoner and place him in a cell with exposed overhead bars, negligence is not deliberate indifference. The actions of these officers show beyond any reasonable doubt that they were not deliberately indifferent to Jackson's serious medical needs.

C

The final issue presented in this appeal is whether summary disposition was properly denied on the claim against the city. A governmental entity cannot be found liable under § 1983 on a respondeat superior theory. Rather, such liability can be imposed only for injuries inflicted pursuant to a governmental "policy or custom." *Monell v Dep't of Social Services of New York City,* 436 US 658, 694; 98 S Ct 2018; 56 L Ed 2d 611 (1978). There must be an affirmative link between the policy or custom and the particular constitutional violation alleged. The alleged policy or custom must be the "moving force" of the constitutional violation in order to establish liability. *Id.* at 694.

Such a policy may be shown by demonstrating that the city manifested a "deliberate indifference" to the medical needs of its pretrial detainees. *City of Canton, Ohio v Harris,* 489 US 378, 391; 109 S Ct 1197; 103 L Ed 2d 412 (1989). Acts of omission, as well as commission, may support a finding of § 1983 liability. However, an alleged policy of inaction must reflect some degree of fault before it may be considered a policy on which § 1983 liability may be based. *Id.* at 388.

This requirement of fault is necessary to establish the causal link between a municipal policy and a constitutional violation. Justice O'Connor elaborated on this standard in her concurring opinion in *Canton:*

Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens[,] [o]nly then can it be said that the municipality has made " 'a deliberate choice to follow a

course of action . . . from among various alternatives.' " [*Id.* at 396.]

In addition, the policy or custom must originate with the decisionmaker possessing final policy-making authority with respect to the omission or commission at issue. *Pembaur v Cincinnati,* 475 US 469, 482; 106 S Ct 1292; 89 L Ed 2d 452 (1986) (plurality opinion). Whether a particular official has final policy-making authority is a question of state law, *St Louis v Praprotnik,* 485 US 112, 123; 108 S Ct 915; 99 L Ed 2d 107 (1988) (plurality opinion), to be decided as a matter of law before the case goes to the jury. *Jett v Dallas Independent School Dist,* 491 US 701, 737; 109 S Ct 2702; 105 L Ed 2d 598 (1989) (plurality opinion).

Finally, it is also important to note that the "deliberate indifference" necessary to give rise to municipal liability for a § 1983 action is not coextensive with the "deliberate indifference" necessary to prove an actionable violation of a pretrial detainee's due process right to adequate medical care. The former requires an objective intent, while the latter requires a subjective one. *Farmer,* 114 S Ct 1981.

Applying these principles to the case at bar leads us to conclude that plaintiffs have made a prima facie showing that Jackson's due process rights may have been violated and that the violation resulted from a city policy of inaction that may evidence a deliberate indifference to those rights. Viewing the record in a light most favorable to the plaintiffs, we conclude that the city objectively knew that the seventh precinct station cells could be dangerous when they housed suicidal detainees. The record shows that over a five-year period there were 128 attempted suicides, the vast majority of which occurred in cells having

exposed overhead bars. In the seventh precinct station alone there were thirteen attempts and one death in the four years before Jackson's detention.

Therefore, the city's policymakers[15] were on notice that the failure to modify the cells with exposed overhead bars was substantially certain to result in the violation of the constitutional rights of those persons known to be suicidal who were placed in those cells in spite of their suicidal tendencies. The evidence would allow a rational trier of fact to conclude that city policymakers made "a deliberate choice to follow a course of [in]action . . . from among various alternatives" and that they were correspondingly deliberately indifferent to the rights of suicidal detainees housed in the seventh precinct station.

### III

Having reviewed the documentary evidence, and drawing all reasonable inferences from that evidence in the nonmovant's favor, we affirm the decision of the Court of Appeals. The case is remanded to the trial court for proceedings consistent with this opinion.

BOYLE, RILEY, MALLETT, and WEAVER, JJ., concurred with CAVANAGH, J.

BRICKLEY, C.J. (*concurring in part and dissenting*

---

[15] The city argues that the plaintiffs have not shown that the omission (i.e., the failure to rectify the problem with the felony cells in the seventh precinct station) originated from a decisionmaker with final policy-making authority. We note that exactly who, or what, this decisionmaker is, is a question of law to be decided in the first instance by the trial court. The trial court in this case has not yet ruled on the issue. Therefore, it is enough for our purposes that plaintiffs allege that "command personnel" attempted to have the bars covered, but that this attempt was halted "by the sole authority of Police Chief William Hart."

*in part).* I agree with the majority that the individual defendants are entitled to judgment as a matter of law, and that the plaintiffs have demonstrated issues of material fact regarding the § 1983 claim against the City of Detroit. 42 USC 1983. I disagree, however, with the majority's conclusion that the plaintiffs failed to state a claim under the public building exception.

The public building exception to the general tort liability immunity enjoyed by governmental agencies provides:

> Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition. [MCL 691.1406; MSA 3.996(106).]

The only issue this case presents in regard to this exception is whether the condition of the cell in which Jackson was detained was dangerous or defective. The majority analyzes this issue solely by reference to *Hickey v Zezulka (On Resubmission),* 439 Mich 408; 487 NW2d 106 (1992), the most recent case decided by this Court to have addressed the public building exception. It is acknowledged that there are important factual differences between that case and the present one. Nevertheless, the majority concludes that *Hickey* should control. *Ante* at 429.

In *Hickey,* the decedent was arrested for drunk driving and placed in a holding cell at Michigan

State University by the Department of Public Safety. The cell had a heater, supported by four metal brackets that extended between one and two inches from the wall. The decedent hanged himself from one of the brackets.

The Court in *Hickey* held that the plaintiff had not stated a claim under the public building exception. The essence of that opinion is quoted by the majority:

> To suggest that any physical feature of a jail cell, otherwise benign, that can conceivably become a part of a plan of one who is desperately driven to self destruction can become a "dangerous or defective condition" under the public building exception statute, simply crosses the outer limits of any reasonable reading of the intent of that statute when considered in the context of its history, purpose, and wording. [*Hickey, supra* at 426.]

I believe that the factual differences between *Hickey* and the instant case make this reasoning inapplicable here.

The cells at the MSU Department of Public Safety were specifically intended for temporary detention; no one had ever been held there for more than a few hours. Before the decedent in *Hickey,* no one had ever attempted or committed suicide in any of the cells. *Id.* at 425.

In contrast, it is generally agreed that the purpose for which Jackson's cell was assigned was as a detention area for Detroit's general prearraignment detainee population. The plaintiff has argued, and I agree, that invariably among this population there are prisoners with deficiencies related to mental illness or substance abuse who will attempt suicide. This is starkly demonstrated by the statistics cited by the majority, which show that a large number of suicide attempts were

made in detainee lockup facilities in the years before Jackson's attempted suicide. *Ante* at 424-425. Unlike the cells in *Hickey,* an integral purpose for which these cells were used was to house people who were mentally ill and potentially suicidal.

Whether a building is dangerous or defective must be determined on the basis of the uses or activities for which it is specifically assigned. *Hickey, supra* at 425. Michigan jurisprudence provides that if a feature of a building is unsafe for the people who the building is designed to serve, that feature can be defective under the public building exception even if the injury itself was caused in part by the actions of the injured. In *de Sanchez v Genoves-Andrews (On Remand),* 179 Mich App 661; 446 NW2d 538 (1989), the plaintiffs' decedent was a patient in a psychiatric hospital. The decedent hanged himself from overhead bars in a hospital bathroom. The Court stated:

> Given that the rest room was assigned for use by potentially suicidal patients at a mental hospital, this condition [the dividing bars placed over the bathroom stall] was potentially dangerous in and of itself. [*Id.* at 669.]

The Court held that a question of fact existed regarding whether the bars were a defective condition. *Id.* at 670. The *de Sanchez* decision was cited with approval by this Court in *Hickey* at 423.

Similarly, in *Lockaby v Wayne Co,* 406 Mich 65; 276 NW2d 1 (1979), the plaintiff had been placed in a cell designated for mentally impaired individuals. He subsequently paralyzed himself by striking his head against the cell wall. Although the cell was specifically designated for mentally impaired persons, it lacked padding and other pre-

cautions tailored to the mentally unstable individuals who were incarcerated. This Court held that the plaintiff stated a valid claim under the public building exception, despite the fact that his injuries were self-inflicted. *Id.* at 76-77. See also *Bush v Oscoda Schools,* 405 Mich 716; 275 NW2d 268 (1979).

I think this case is more factually analogous to *Lockaby* and *de Sanchez* than to *Hickey.* In *Hickey,* the facilities in question were simply not meant to hold mentally unstable individuals, nor was there any reason to suspect that the cells would be used for that purpose. In this case, as in *Lockaby* and *de Sanchez,* the facility at issue was designed and intended for use by people who were potentially suicidal.

Another important factual difference between *Hickey* and the instant case is the method of destruction. The decedent in *Hickey* hanged himself from an inch-long metal extension, attaching a heater to the wall of his cell. *Id.* at 416. In this case, the decedent hanged himself on overhead bars in his cell, easily reachable and often used in the past for suicide attempts.

There is a paradigmatic difference between a case like *Hickey,* in which a person who wants to kill himself searches for and finds a way to do so, and a case in which an easy method of self-destruction is presented for an interested person to use. I submit this case is properly categorized as the latter type. With full knowledge of the mental infirmities certain to be present among those who inhabited the cells of the seventh precinct, the City of Detroit equipped the cells with overhang bars easily converted into a scaffold.

This is not, therefore, a case merely concerned with safety *in* public buildings, as the majority suggests. The injury to Mr. Jackson was occa-

sioned in large part by the physical condition of the building itself. See *Reardon v Dep't of Mental Health,* 430 Mich 398, 413; 424 NW2d 248 (1988). A catwalk without a rail might not be a defective condition in and of itself, but no one would argue the point if it was specifically intended for use by the blind. Thus, Mr. Jackson's cell, which was designed to hold people who might be contemplating self-destruction, was also defective. This is painfully evident from the fact that of the 128 suicide attempts in Detroit police lockups between 1978 and 1983, 86 percent occurred in lockups with exposed overhead bars.

Because Mr. Jackson's cell presented such an obvious mode for his destruction, and because it was designed in part to hold mentally unstable people like Mr. Jackson, I would hold that the plaintiffs have at least demonstrated a question of fact in regard to whether there existed a dangerous or defective condition in the cell under the public building exception. I therefore respectfully dissent in part from the majority.

LEVIN, J., concurred with BRICKLEY, C.J.